SOLOMON SIMON, JACOB L. SOLOMON AND PATRICK GALANTE, PROSECUTORS, v. PETER O'TOOLE, CLERK OF THE CITY OF NEWARK, NEW JERSEY; BOARD OF COMMISSIONERS OF THE CITY OF NEWARK, NEW JERSEY, AND PRUDENTIAL INSURANCE COMPANY OF AMERICA, RESPONDENTS.

Argued May 7, 1931—Decided June 18, 1931.

Before Justices TRENCHARD, DALY and DONGES.

For the prosecutors, *Herman W. Brams* and *Merritt Lane.*

For the respondents, *Frank A. Boettner, Frederick H. Groel, Alfred Hurrell* and *Charles B. Bradley.*

The opinion of the court was delivered by

TRENCHARD, J.   On October 15th, 1930, the board of commissioners of the city of Newark adopted an ordinance which

authorizes the execution of a contract with the Prudential Insurance Company of America, which provides, as hereinafter more fully stated, for the acquisition by the company of two entire blocks in Newark, and the construction on a part thereof by the company of modern housing facilities, and for the purchase by the city from the company of the remaining land for the purpose of parks and playgrounds, pursuant to the provisions of chapters 201 and 202 of the laws of 1929.

Before the execution of the contract, the present writ of *certiorari* was allowed certain taxpayers of the city bringing up such ordinance for review. The reasons filed challenge the validity of the ordinance upon several grounds which may be restated as follows: (1) The ordinance contemplates the expenditure of public funds for a private purpose in aiding the Prudential to carry out the housing plan in question. (2) The ordinance constitutes an abuse of discretion by the commissioners because (a) the price to be paid by the city for the acquisition of the lands is greatly in excess of their true value, and because (b) the lands to be acquired by the city are wholly unsuitable for the purpose of a public park and will not in fact be used as such. (3) The board of commissioners had no legal power to adopt an ordinance for the purchase of parks and playgrounds because under the governing statute all executive, legislative and judicial powers with respect to public parks are lodged solely in the commissioner assigned as director to the department of parks and public property, who voted against the adoption of the ordinance.

We think that the ordinance contemplates the expenditure of public funds for a public purpose only, and not for the purpose of aiding a private enterprise.

The prosecutors argue that the real purpose of the ordinance is to authorize such expenditure to aid the Prudential in carrying out a housing plan, thereby depriving the prosecutors, as taxpayers, of their property without due process of law in violation of the constitution of New Jersey and of the fourteenth amendment to the constitution of the United States.

We think not. In passing we point out, as was said in *North Baptist Church* v. *Orange*, 54 *N. J. L.* 111 (a somewhat similar case) :

"It is observable that it is no part of our functions to decide whether the scheme adopted in this instance was a wise one. We have no power to try the question whether the advantages that would accrue to the public by reason of this improvement would be greater or less than the burden which it would impose, nor whether the degree of public benefit is so small that it does not justify the taking of land against the will of its owner. These questions have been confided by the legislature in the common council. If it should appear that there could not inure to the public any advantage whatever, and that the scheme is designed solely for the benefit of private individuals, the court could interpose in favor of the landowner whose property is menaced. But when it is perceived that there is a degree of public benefit likely to spring out of the enterprise, all questions of policy in executing it are devolved upon the common council."

Now section 1 of the ordinance recites the desire of the city that "in the interest of the public health, safety and morals certain blocks of unsafe and unsanitary dwellings * * * should be replaced in part by new housing facilities constructed in accord with proper standards of sanitation and safety and provided with appropriate parks and playgrounds." Section 2 recites the willingness of the Prudential to acquire the tracts of land upon which the objectionable dwellings stand and to construct upon a part thereof such new housing facilities and to convey to the city certain other parts for the purpose of such parks and playgrounds. The succeeding sections authorize the execution of an agreement, fully set forth therein, between the city and the Prudential for carrying out the recited purposes and provide for financing the cost of the purchase by the city of that portion of the blocks in question which the city proposes to convert into parks and playgrounds. That agreement in substance is as follows: (1) The Prudential agrees to take all possible steps to acquire, pursuant to chapters 201 and 202 of the laws of 1929, the

blocks in question at the lowest prices obtainable and to submit to the city a project for the construction thereon of the new housing facilities occupying strips thirty feet deep on two fronts, in such manner that there shall be left vacant an interior strip one hundred and forty feet wide separating the housing facilities constructed on existing street fronts. (2) Upon approval by the city of the project, the Prudential contracts to carry the same to completion. (3) The city, in consideration of the acquisition of the blocks by the Prudential *and of the Prudential's contractual undertaking to construct the housing facilities,* agrees to purchase from the Prudential such part of the one hundred and forty-foot strip as the Prudential may have acquired, "for the purpose of parks and playgrounds to be maintained by the city for the benefit of the public at large," and the city agrees to pay to the Prudential as the purchase price thereof such proportion of the total price paid by the Prudential for the lands acquired by it as the area of the land purchased from the Prudential bears to the total area acquired by the Prudential; and the city agrees to acquire for such park purposes, either by treaty or condemnation, such portions of the tracts as shall not have been acquired by the Prudential; *provided, however, that the price to be paid by the city for the one hundred and forty-foot strip shall in no case exceed $1,200,000.*

It will be observed that the only money to be paid by the city pursuant to the contract consists of the purchase price of the one hundred and forty-foot strip to be acquired for public parks and playgrounds, and that this price, the maximum of which is carefully limited in the interest of the city, is based upon the proportion that the area of the land purchased from the Prudential bears to the total area acquired by the Prudential. The city's obligation to purchase this land and to pay to the Prudential the contract price does not arise until the primary public purpose of the ordinance has been, accomplished, namely, the submission to the city of a housing project satisfatory to and approved by the city, raising the resultant obligation of the Prudential to complete the project and thereby eliminate two blocks of unsafe and unsan-

itary dwellings. Once that object has been attained the city is ready to provide for parks and playgrounds in the neighborhood which shall be available not only to the new housing facilities but are "to be maintained by the city for the benefit of the public at large." For the acquisition of land for the latter purpose and for that alone the city undertakes to expend public funds. Neither the ordinance nor the contract, therefore, bear upon their face any intrinsic evidence of a purpose to expend public money in aid of a private enterprise. On the contrary, both recite the purpose of the city to procure an improvement in the housing situation in the particular neighborhood, and in connection with that improvement to provide appropriate parks and playgrounds for the benefit of the public at large. These expressed objects and the provisions of the ordinance and contract appear to be in fact the true purpose of the ordinance even after a consideration of the extrinsic evidence introduced by the prosecutors, since, as we think, that evidence is inadequate to sustain the position of the prosecutors and is rebutted by evidence introduced on behalf of the city. Wide publicity preceded and attended the adoption of the ordinance. The objects sought to be attained were very fully discussed at public meetings of the board of commissioners. The facts disclosed are dispositive of the case upon the point now under consideration, being effective to supply that "rational basis" which the courts have said is sufficient to justify the exercise of legislative action.

The prosecutors urge that, because the commissioners admittedly were moved to their judgment to purchase the land in question for parks and playgrounds by a consideration of the incidental benefit to the public that would result from construction of the housing facilities, the motive for their action vitiates the legality of the purchase. But we think that this view confuses the motive for the action with the character of the action itself. The legality of legislative action directed towards an admittedly public purpose cannot depend upon whether or not particular benefit may result to property and individuals in the immediate neighborhood.

In support of the charge that the effect of the ordinance

is to permit the use of public funds for other than a public purpose in violation of constitutional provisions the prosecutors cite among other cases: *In re Opinion of the Justices,* 98 *N. E. Rep.* 611; *In re Opinion of the Justices,* 91 *Id.* 405; *City of Boston* v. *Talbot, Ibid.* 1015; *Salisbury Land and Improvement Co.* v. *Commonwealth,* 102 *Id.* 619.

But we think that none of these decisions are dispositive of the present case for the reason that they are concerned only with the question whether a particular use is or is not a public use.

In this respect they resemble the well-known decision of our own Court of Errors and Appeals in *The Tide-Water Co.* v. *Coster,* 18 *N. J. Eq.* 518, in which the power of taxation had been exercised for reclaiming large tracts of meadow land. As to the purpose in view, Chief Justice Beasley said (page 521):

"To make this vast region fit for habitation and use, seems to me plainly within the legitimate province of legislation; and to effect such ends, I see no reason to doubt that both the prerogatives of taxation and of eminent domain may be resorted to * * *. It is the resulting general utility which gives such enterprises a kind of public aspect, and invests them with privileges which do not belong to mere private interests."

The Chief Justice then goes on to illustrate the nature and define the extent of the principle that empowers the legislature to determine what is a public use and to authorize the taking of private property for such use. He says (page 521):

"It is one of the legislative prerogatives to decide the important question, whether an enterprise or scheme of improvement be of such public utility as to justify a resort, for its furtherance, to the exercise of the power of taxation or eminent domain. Primarily, the judiciary has no concern in such matter. And not only this, but if the public interest be involved, to any substantial extent, and if the project contemplated can, in any fair sense, be said to be promotive of the welfare or convenience of the community, the legislative adoption of such project is a determination of the question,

from which there is no appeal, and over which no other branch of the government has any supervision whatever."

And at page 523:

"The object proposed, and for which provision is made in the statute under review, being, then, one tending to the benefit of the community at large, must be regarded, upon principles which are too valuable to social interests to be disturbed, as coming exclusively under legislative control."

It is of course conceded by the prosecutors that the devotion of lands to public parks and playgrounds constitutes a public use. It is their contention that the true purpose of the ordinance under review is not to provide parks and playgrounds. In support of this position it is idle to cite decisions adjudicating upon the nature of a public use. The distinction that we point out is clearly taken in *City of Boston* v. *Talbot, supra,* cited by the prosecutors. It was there said:

"The question whether the use for which land is taken under the right of eminent domain is a public use is a judicial question, and the determination of the legislature upon it may be revised by the court. (Citing cases.) * * * *But if the use for which the taking is made is public, the question whether the taking of a particular piece of real estate is necessary or expedient is a legislative question, upon which the decision of the legislature, as a tribunal of fact, is conclusive."*

*In re Opinion of the Justices,* 98 *N. E. Rep.* 611, upon which the prosecutors chiefly rely, is an illustration of precisely what the present case is not, namely, the expenditure of public funds, "for the aggrandizement of individuals and only for the incidental benefit of the public." In that case the question related to the constitutionality of an act permitting a state agency financed by taxation to go into the business of buying, renting and selling real estate in order to provide homes "for mechanics, laborers, or other wage earners," and thereby to improve "the public health by providing homes in the more thinly populated areas of the state

for those who might otherwise live in the most congested areas of the state."

*Salisbury Land and Improvement Co. v. Commonwealth, supra,* also relied upon by the prosecutors, denied the legislative power to authorize the condemnation for park purposes of more lands than necessary and the resale to private owners of such excess lands.

We think that the action of the board in enacting the ordinance was not an abuse of discretion.

The prosecutors specify two grounds upon which the abuse is predicated: (1) That the lands contemplated to be purchased for a public park are wholly unsuitable for such purpose, and (2) that the price of the lands to be purchased for a public park is greatly in excess of their true value for such purpose.

Both of these points must, of course, be considered in the light of the principles of law governing the scope of the judicial review of an ordinance enacted in accordance with prescribed procedure and in the exercise of lawful powers. Briefly stated, the rule is that this court will not in such a case substitute its discretion for that of the board of commissioners if any rational basis can be found to support the propriety of the action taken.

Prosecutors' reason for setting aside the ordinance as an abuse of discretion is that the lands in question are not suitable for "a public park." The ordinance and the contract, however, contemplate the purchase of these lands for parks *and playgrounds.* We make no point of that except to say that the purpose that inspired the entire ordinance, no less than its express language, emphasizes playgrounds as an important feature of the plan, and contemplates that the lands shall be devoted in part to that object.

We believe that the evidence amply justifies the conclusion that the lands contemplated to be purchased for parks and playgrounds are suitable for such purposes.

The choice of the location of this particular project was determined by the city commissioners after an intensive survey by the health and police authorities of the city.

The testimony tended to show that the district is a congested one and ill provided with park and playground facilities; that the area is reasonably large considering the neighborhood; that the proposed housing facilities, shutting in the area on two sides will be an advantage in sheltering the playground for the protection of small children, and measurably eliminates the hazard of street crossing; that, being open at both ends, it affords ready access to the general public for park as well as playground purposes. The weight of the evidence affords the "rational basis" requisite to sustain the discretion exercised by the board in authorizing the acquisition of these lands for park and playground purposes.

We think that the evidence justifies the inference that the maximum price to be paid by the city is not excessive. This question, like the last, is addressed to the discretion of the board of commissioners, and the objection cannot prevail if there is evidence of any rational basis to sustain the particular exercise of discretionary power. The sum of $1,200,000 represents the maximum sum which the city could be called upon to pay for the entire one hundred and forty-foot strip whether acquired from the Prudential or from other owners.

It appears that the proportionate area method of fixing the price was adopted because the project was a joint one in the sense that the Prudential would not have entertained the housing project were it not for the city's undertaking to purchase the surplus land in the blocks for parks, and the city was moved to the latter undertaking only by the agreement of the Prudential to construct the new housing facilities. Furthermore, the boundary lines of the land to be acquired by the city pass through nearly every structure on the blocks in question, so that, were it not for the Prudentials' purchase of the outside strips for the peculiar use contemplated, the city would have had to pay practically the entire value of the blocks for the inside area. In the light of these unusual circumstances, and in view of the protection afforded to the city's interests by the fixing of a maximum contract obligation on its part, we cannot say that the discretion exercised by the board was wrongly exercised. The area of the land

to be acquired by the city is approximately seventy per cent. of the total area. It is stipulated that the two blocks of land as a whole have a fair value of not less than $1,714,000, seventy per cent. of which amounts to $1,200,000, the maximum price to be paid by the city. It follows: that if the method of apportionment fixed by the contract is sound, the maximum price to be paid by the city is fair. The prosecutors, however, insist that the price to be paid by the city should have been measured by arbitrary rules commonly employed in less complex situations for the ascertainment of the value of city lands having no existing street frontages. Both sides introduced testimony based upon an application of those conventional rules to the case in hand, and we have considered it, and conclude that, in view thereof, the maximum price to be paid is justified.

We think that the board of commissioners had power to adopt the ordinance in question.

The city of Newark is a municipal corporation originally organized under a special charter in 1836, revised in 1857. Thereunder the powers of the city government were vested in a mayor and common council. The statute of 1911 (*Pamph. L., p.* 706), authorized the common council by ordinance to purchase and condemn lands for park purposes. In 1917 the Home Rule act (*Pamph. L., p.* 319), which was in effect a revision of all existing laws conferring powers of municipal government provided (article 36, section 1) that "the governing body" of every municipality shall have power to acquire and maintain "parks" and "playgrounds" and for these purposes to take in fee or otherwise, by purchase or condemnation, any lands. Later the act of 1911 was repealed. *Pamph. L.* 1917, *p.* 635. The power to purchase and maintain parks and playgrounds so far as it is derived from that provision of the Home Rule act resided in "the governing body" of the city, which is defined by section 2 of article 1 "as the board or body having control over the subject-matter in connection with which such term is used, and having the power and authority to legislate thereon." It follows that by that act the common council of the city was

vested with the power to purchase and maintain parks and playgrounds.

On November 13th, 1917, a few months after the Home Rule act became effective, Newark duly adopted the Walsh act (*Pamph. L.* 1911, *p.* 462), thereby lodging all of the city's powers of government in a board of five commissioners. Section 4 of the Walsh act last amended by *Pamph. L.* 1930, *p.* 996, and in force at the date of the adoption of the ordinance now under review, provides that the board of commissioners shall have all executive, administrative, judicial and legislative powers and duties theretofore had by the mayor and common council and all other executive or legislative bodies in any municipality adopting the provisions of the act; that "said board' shall have complete control over the affairs of such municipality," and that such powers and duties shall be distributed into and among five departments, one of which is the "department of parks and public property." The next succeeding paragraphs provide that the board of commissioners shall determine the powers and duties to be performed by each department and shall assign such powers and duties to such department as they in their judgment deem appropriate, and shall designate one commissioner to be director of each one of the several departments. Pursuant thereto the board on May 21st, 1929, by resolution purported to distribute to the department of parks and public property all executive, administrative, judicial and legislative authority and duties relating to the public parks, and designated Commissioner Gillen to be director of that department, and he held that office at the time of the introduction and final passage by the board of the ordinance under review, and opposed its adoption, and alone voted against it when it was adopted by the affirmative votes of all of the other four commissioners.

We think that the power invoked in the present instance by the board of commissioners as a body is derived not only from article 36, section 1, of the Home Rule act authorizing municipalities to acquire parks and playgrounds,

but also from article 14, section 2 of that act which provides that every municipality shall have power to make such ordinances as they may deem necessary and proper for good government, order, protection of person and property, *and for the preservation of the public health, safety and prosperity of the municipality;* and we also think that the purpose in view could be accomplished only by ordinance, and that the requisite ordinance could not be adopted by a single commissioner, but must be adopted by the affirmative vote of a majority of the board of commissioners, as was done in the present case.

Article 14, section 2, of the Home Rule act grants to every municipality power to make "such other ordinances as they may deem necessary and proper * * * for the preservation of the public health, safety and prosperity of the municipality and its inhabitants," and that power the city has invoked in the present case, and it has done so by ordinance, as expressly authorized, and moreover has done so by the procedure requisite under the act to an exercise of the power to purchase land for parks and playgrounds as conferred by article 36, section 1. Article 11, section 6, of the Home Rule act as amended (*Pamph. L.* 1918, *p.* 479), provides that: "No municipality shall enter into any contract whatsoever, the cost of which is to be met by funds other than those included in the budget of appropriations for the year, unless prior thereto there shall have been regularly adopted by the governing body of such municipality an ordinance authorizing an appropriation sufficient to meet the cost of carrying out the provisions of such contract; * * *." The ordinance under review bears in its title, and in its text, intrinsic evidence that the cost of the contract for the purchase of the lands in question is to be met by funds other than those included in the current appropriation, namely, by the proceeds of the sale of bonds. Consequently, an ordinance was an indispensable condition to the exercise of the power to purchase these lands.

It follows that the ordinance in question could be adopted only by the board of commissioners, as was done.

The prosecutors contend that because under the Walsh act the legislative powers of the city were distributed, with respect to parks, into the department of parks and public property, it became competent for the director of the department of parks and public property and for him alone to take the action necessary to effect a purchase of land for a public park and playground. This contention fails to take note of the fact that the distribution of legislative powers to the several departments must certainly be subject to other controlling provisions of law which, in certain cases, either expressly or impliedly reserve the legislative power to the board acting as a body.

Such a reservation is clearly implied in the instance in which the legislature has either prescribed or authorized the exercise of municipal powers by means of an ordinance. Section 3 of the Walsh act as amended (*Pamph. L.* 1916, *p.* 406) provides that "every city * * * shall be governed by a board of commissioners consisting of five commissioners, * * * each of whom shall have the right to vote on all questions coming before the board of commissioners. A majority of the members of the board of commissioners shall constitute a quorum and the affirmative vote of a majority of all the members shall be necessary to adopt any motion, resolution or ordinance, or pass any measure unless otherwise provided for in this act. * * * The mayor shall have no power to veto any measure, but *every ordinance passed by the board of commissioners* shall be recorded and signed in the book in which it is recorded by a majority of all the commissioners before it shall be in force." The Home Rule act prescribes no different procedure, but by article 10, section 1, defines the term "ordinance" as *"any act* or regulation *of the governing body* of any municipality reduced to writing, and required to be read at more than one meeting thereof and published."

The quoted language of section 3 of the Walsh act and the subsequent language of that section clearly contemplates that, in some cases, at least, legislative action is to be taken by

the board of commissioners acting as a body, for otherwise no effect could be given to the elaborate provisions for the procedure necessary to adopt an ordinance. Bearing in mind the strong implications arising from this language, it cannot reasonably be supposed that the legislature in distributing the powers of government amongst the several departments contemplated the enactment of *ordinances* by their respective directors. To postulate a delegation of power so extraordinary and so repugnant to our institutions would demand a clear and unqualified expression of the legislative will such as is wholly wanting in the Walsh act or in any other legislation. On the contrary, section 4 of the Walsh act provides that "the board of commissioners shall determine the powers and duties to be performed by each department and shall assign such powers and duties to such department as they in their judgment deem appropriate." There is no suggestion of a legislative purpose to denude the board as a body of the power to adopt an ordinance where an ordinance is essential to the matter in hand. The contrary is clearly indicated by the various provisions of law to which we have alluded. Moreover, this view is supported by the contemporaneous practical construction that has been universally accorded to these provisions from the time of the first enactment of the Walsh act to the present. We know of no case disclosing even an attempt on the part of a single commissioner assigned as director of a department to enact an ordinance. On the other hand, we find several cases in our courts, discussing the powers of government granted by the Walsh act, where the ordinances were enacted by the whole board of commissioners; for illustration: *Loughran* v. *Jersey City,* 86 *N. J. L.* 442; *Weber* v. *Atlantic City,* 102 *Id.* 79.

The writ will be dismissed, with costs.