WILLIAM MARVIN, as Administrator of the Estate of John L. Marvin, deceased, v. HOUSING AUTHORITY OF JACKSONVILLE, FRED B. BRADSHAW, as Chairman and member of the Commission of the Housing Authority of Jacksonville, LOUIS R. FENDIG, as Vice-Chairman and member of the Commission of the Housing Authority of Jacksonville, WM. A. STANLY, GEORGE W. SIMONS, JR., and JAMES T. DANIELS, as members of the Commission of The Housing Authority of Jacksonville, RAY O. EDWARDS, as Secretary and Executive Director of The Housing Authority of Jacksonville, and CITY OF JACKSONVILLE, a municipal corporation.

183. So. 145.

En Banc.

Opinion Filed July 27, 1938.

592

*W. C. Johnson,* for Appellant;

*Kent, Kassewitz, Wheeler & Crenshaw* and *Austin Miller,* for Appellees.

CHAPMAN, J.—On June 15, 1938, plaintiff, as a taxpayer, filed in the Circuit Court of Duval County, Florida, his bill of complaint alleging, among other things, that The Housing Authority of Jacksonville, Florida, was organized pursuant to Chapter 17981, Laws of Florida, Acts of 1937; that the Housing Authority selected a site for a municipal low cost housing project and authorized the acquisition of land and a survey of slum conditions in the City of Jack-

sonville that for the purpose of obtaining capital the Housing Authority entered into a loan contract with the United States Housing Authority whereby it was provided that a loan would be made by it to the Housing Authority of Jacksonville, Florida, in the sum of $1,027,000.00, being 90% of the estimated cost of the project; that the Housing Authority of Jacksonville agreed to issue debentures or bonds for said amount purchasable by the United States Housing Authority for the purpose of retiring the indebtedness represented by the loan. The bill of complaint also described the lands by metes and bounds and alleged that it is situated within the City of Jacksonville and commonly known as Brentwood Park Housing Project, and that the plaintiff's decedent owned an interest, in part, in and to the lands therein described.

The Housing Authority of the City of Jacksonville proposed to issue additional bonds in the sum of $125,000.00 to be absorbed by investors of the City of Jacksonville and vicinity. The $125,000.00 represented the remaining 10% of the estimated cost of the project. The Authority had entered into a contract with the United States Housing Authority whereby, over a period of sixty years, the bonds of the Housing Authority of Jacksonville are to be amortized, and the U. S. H. A. will make to the Housing Authority of Jacksonville annual contributions of $43,925.00 as a part of the retirement or sinking fund whereby the principal and interest of said bonds will be paid.

The Housing Authority of the City of Jacksonville entered into a contract with the City of Jacksonville providing for the elimination of unsafe and unsanitary dwelling units of said City and other services were pledged by the City of Jacksonville to the Housing Authority of said City. The U. S. H. A. agreed to advance to the Housing Authority of Jacksonville $80,000.00 for the purpose of pay-

ing preliminary expenses in connection with the project; the Authority proposes to issue its said bonds for said project and to do so without obtaining the approval of the qualified freeholders of said City prior to the issuance; the Authority represents that the real and personal property owned and administered by the authority is exempt from all State, County and Municipal ad valorem taxes under the terms and provisions of Chapter 17983, Laws of Florida, Acts of 1937.

The bill of complaint further alleges that the trust indenture to be signed by the Authority and the U. S. H. A. will not constitute a lien upon the corpus of the real estate or the physical property of the Authority, but merely creates and constitutes a lien on the rentals and revenues derived from the operation of the completed project. It is likewise alleged that the proposed "low cost housing project" is not for a public purpose, as contemplated by law, and that the power of eminent domain should not be exercised by said Authority to acquire property, because it is not for a public purpose and that to permit it so to do would be in contravention with the Constitution of Florida; and that the proposed issuance of the debentures or bonds of the Authority without a vote of the freeholders is like-wise in contravention with the Constitution of Florida.

The prayer of the bill of complaint is for a temporary and permanent injunction against the City of Jacksonville: (a) from carrying out the contracts between the Housing Authority of Jacksonville and the City of Jacksonville identified as Exhibits 5 and 6; (b) that the Housing Authority be enjoined temporarily and permanently from issuing any of the bonds or debentures for the purposes named in the bill of complaint; (c) that it be temporarily and permanently enjoined from acquiring title to lands and property within the City of Jacksonville for a slum. clearance low

cost housing project; (d) that the power of taking over property under Chapter 17981 is not a public purpose; (e) that the proposed bonds are obligations of the City of Jacksonville within the meaning of Amended Section 6 of Article IX of the Constitution of Florida. Other allegations are a part of the bill of complaint but are unnecessary to recite. Exhibits numbered from 1 to 7, inclusive, are attached to and by appropriate language made a part of the bill of complaint.

On June 15, 1938, the Housing Authority of Jacksonville filed a motion to dismiss the bill of complaint on the grounds: (a) that there is no equity in the bill; (b) that it affirmatively appears from the bill of complaint that the purposes of Chapter 17981, Acts of 1937, are public purposes; (c) that Chapter 17981, Acts of 1937, Laws of Florida, providing for the exercise of the power of eminent domain will not violate the Declaration of Rights of the Constitution of Florida: (d) it appears upon the face of the bill of complaint that the bonds or debentures of the Housing Authority are not obligations of the City of Jacksonville within the meaning of Section 6, Article IX, of the Constitution of Florida; (e) that Chapter 17983, Laws of Florida, Acts of 1937, exempting real and personal property of the Housing Authority of Jacksonville does not violate Section 1 of Article IX of the Constitution of Florida: (f) the bill of complaint shows that the taxing power of the City of Jacksonville is not pledged, nor any of its revenues obligated, but that the lien affects the income only of the Housing Authority of Jacksonville.

The City of Jacksonville filed a motion to dismiss the bill of complaint on the grounds, viz.: (a) that the City of Jacksonville was not a proper party to the suit; (b) the bill of complaint states no equitable grounds for relief against the City of Jacksonville.

Upon a hearing on the part of counsel for the respective parties, the court below made and entered an order sustaining the motions to dismiss and did dismiss the bill of complaint on June 16, 1938, and an appeal was perfected from said order of dismissal and the cause is here for review on a number of assignments of error. The parties will be referred to in this opinion as they appeared in the court below as plaintiff and defendants.

1. It is contended that Chapter 17981, Laws of Florida, Acts of 1937, is invalid because the low cost housing and slum clearance is not a public purpose within the meaning of the law. In construing a statute, resort may be had, if necessary, to the history of the legislation and to public history of the times in which it was passed in order to determine its purpose, meaning and effect, as an aid in determining its validity. See Sheip Co. v. Amos, 100 Fla. 863, 130 So. 699. The 1937 Legislature made a finding and declaration of necessity when enacting Chapter 17981, and in so doing employed the following language:

"Section 2. FINDING AND DECLARATION OF NECESSITY. * * * It is hereby declared:

"(a) that there exist in the State insanitary or unsafe dwelling accommodations and that persons of low income are forced to reside in such insanitary or unsafe accommodations; that within the State there is a shortage of safe or sanitary dwelling accommodations available at rents which persons of low income can afford and that such persons are forced to occupy overcrowded and congested dwelling accommodations; that the aforesaid conditions cause an increase and spread of disease and crime and constitute a menace to the health, safety, morals and welfare of the residents of the State and impair economic values; that these conditions necessitate excessive and disproportionate expenditures of public funds for crime prevention

and punishment, public health, welfare and safety, fire and accident protection, and other public services and facilities; (b) that slum areas in the State cannot be cleared, nor can the shortage of safe and sanitary dwellings for persons of low income be relieved, through the operation of private enterprise, and that the construction of housing projects for persons of low income (as herein defined) would therefore not be competitive with private enterprise; (c) that the clearance, replanning and reconstruction of the areas in which insanitary or unsafe housing conditions exist and the providing of safe and sanitary dwelling accommodations for persons of low income (including the acquisition by a housing authority of property to be used for or in connection with housing projects or appurtenant thereto) are exclusively public uses and purposes for which public money may be spent and private property acquired and are governmental functions of public concern; (d) that it is in the public interest that work on projects for such purposes be commenced as soon as possible in order to relieve unemployment which now constitutes an emergency; and the necessity in the public interest for the provisions hereinafter enacted, is hereby declared as a matter of legislative determination."

The objective here is clearly shown by the above finding and declaration of the Legislature.

Section 12 of the Declaration of Rights of the Constitution of Florida provides:

"Sec. 12.   No person shall be subject to be twice put in jeopardy for the same offense, nor compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property without due process of law; nor shall private property be taken without just compensation."

Likewise Section 29 of Article XVI of the Constitution of Florida provides:

"Section 29. No private property nor right of way shall be appropriated to the use of any corporation or individual until full compensation therefor shall be first made to the owner, or first secured to him by deposit of money; which compensation, irrespective of any benefit from any improvement proposed by such corporation or individual, shall be ascertained by a jury of twelve men in a court of competent jurisdiction, as shall be prescribed by law."

Section 6042 C. G. L., read in connection with the quoted provisions, means that when private property is sought to be taken it must be taken for a public use or purpose and not a private use or purpose, but when taken as provided by law, it must be fully compensated for. See Demeter Land Co. v. Florida Public Service Co., 99 Fla. 954, 128 So. 402; State, ex rel. Moody, v. Jacksonville, T. & K. W. R. Co., 20 Fla. 616; Wilton v. County of St. Johns, 98 Fla. 26, 123 So. 527; Isleworth Grove Co. v. County of Orange, 79 Fla. 208, 84 So. 83; Spafford v. Brevard County, 92 Fla. 617, 118 So. 451.

An examination of the Constitution and Statutes of Florida and the decisions of this Court, *supra,* shows that the slum clearance and low cost housing project provided for by Chapter 17981, Acts of 1937, presents an entirely new question for the consideration of this Court, and authorities from other jurisdictions must be examined into.

In the case of Green v. Frazier, 253 U. S. 233, 40 Sup. Ct. 499, 64 L. Ed. 878, the Court had before it the constitutionality of a series of Acts passed by the Legislature of the State of North Dakota. One of the Acts gave a Commission power to operate by the State of North Dakota penal, charitable or educational institutions, and to

accomplish its objectives certain powers of eminent domain were provided; likewise to fix the buying and selling prices of utilities, industries and business projects and with power to negotiate bonds thereof, and $200,000.00 from the Treasury of the State of North Dakota was appropriated to carry out the provisions of the Acts. The law was sustained by the Supreme Court of the State of North Dakota and upon an appeal to the United States Supreme Court the following language was used:

"In the present instance under the authority of the constitution and laws prevailing in North Dakota the people, the Legislature, and the highest court of the State have declared the purpose for which these several acts were passed to be of a public nature, and within the taxing authority of the State. With this united action of people, legislature and court, we are not at liberty to interfere unless it is clear beyond reasonable controversy that rights secured by the Federal Constitution have been violated. What is a public purpose has given rise to no little judicial consideration. Courts, as a rule, have attempted no judicial definition of a 'public' as distinguished from a 'private' purpose, but have left each case to be determined by its own peculiar circumstances. Gray, Limitations of Taxing Power, par. 176, 'Necessity alone is not the test by which the limits of State authority in this direction are to be defined, but a wise statesmanship must look beyond the expenditures which are absolutely needful to the continued existence of organized government, and embrace others which may tend to make that government subserve the general well-being of society, and advance the present and prospective happiness and prosperity of the people.'" * * *

In the case of New York City Housing Authority v. Muller, 270 N. Y. 333, 1 N. E. (2nd) 153, the New York Housing Act was before that Court. In that case the New

York Housing Authority brought suit to acquire title to certain property for the purpose of altering, clearing, remodeling and reconstructing dwelling accommodations for persons of low income within the City of New York, and the suit was resisted upon the ground that the purpose for which the property was to be taken was not for a public use or public purpose and the lower court in the State of New York permitted or allowed the taking of the property for this purpose and the same was appealed to the Supreme Court of the State of New York where the same was affirmed and the following language used:

"* * * The public evils, social and economic, of such conditions, are unquestioned and unquestionable. Slum areas are the breeding places of disease which takes toll not only from denizens, but, by spread from the inhabitants of the entire city and state. Juvenile delinquency, crime, and immorality are there born, find protection, and flourish. Enormous economic loss results directly from the necessary expenditure of public funds to maintain health and hospital services for afflicted slum dwellers and to war against crime and immorality. Indirectly there is an equally heavy capital loss and a diminishing return in taxes because of the areas blighted by the existence of the slums. Concededly, these are matters of state concern (Adler v. Deegan, 251 N. Y. 467, 477, 167 N. E. 705), since they vitally affect the health, safety, and welfare of the public. Time and again, in familiar cases needing no citation, the use by the Legislature of the power of taxation and of the police power in dealing with the evils of the slums, has been upheld by the courts. Now, in continuation of a battle, which if not entirely lost, is far from won, the Legislature has resorted to the last of the trinity of sovereign powers by giving to a city agency the power of eminent domain. We are called upon to say whether under the facts of this

case, including the circumstances of time and place, the use of the power is a use for the public benefit—a public use—within the law. * * *

"It is also said that since the taking is to provide apartments to be rented to a class designated as 'persons of low income,' or to be leased or sold to limited dividend corporations, the use is private and not public. This objection disregards the primary purpose of the legislation. Use of a proposed structure, facility, or service by everybody and anybody is one of the abandoned universal tests of a public use. Mount Vernon-Woodberry Cotton Duck Co. v. Alabama Interstate Power Co., 240 U. S. 30, 32, 36 S. Ct. 234, 60 L. Ed. 507; Strickley v. Highland Boy Gold Mining Co., 200 U. S. 527, 26 S. Ct. 301, 50 L. Ed. 581, 4 Ann. Cas. 1174; Rindge Co. v. County of Los Angeles, 262 U. S. 700, 43 S. Ct. 689, 67 L. Ed. 1186; Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 161, 162, 17 S. Ct. 56, 41 L. Ed. 369." * * *

In Spahn v. Stewart, 268 Ky. 97, 103 S. W. (2nd) 651, the court had before it an Act passed by the Legislature of the State of Kentucky having as its objective the clearance of slums and to erect and maintain low cost houses in keeping with modern, sanitary and safety methods. These houses when completed were to be rented to persons of low incomes. The Act authorized the issuance and sale of tax exempt bonds of the Authority; it had the power of exercising the right of eminent domain, and the rents when collected were to be used in retiring the said bonds of cost of construction. That Act in many essential details is similar to Chapter 17981, Acts of 1937, Laws of Florida, now before this Court. The legal sufficiency of Chapter 113, Acts of 1934, Laws of the State of Kentucky, was assailed on many grounds unnecessary to recite but the Act

was by the Supreme Court of the State of Kentucky sustained and in so doing, in part, said:

" 'A public purpose * * * has for its objective the promotion of the public health, safety, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within a given political division * * * the sovereign powers of which are exercised to promote such public purpose.' Green v. Frazier, 44 N. D. 395, 176 N. W. 11, affirmed in the U. S. Supreme Court, 253 U. S. 233, 40 S. Ct. 499, 65 L. Ed. 878, see infra. See, also, Carman v. Hickman County, 185 Ky. 630, 215 S. W. 408; Barrow v. Bradley, 190 Ky. 480, 227 S. W. 1016; Barker v. Crum, 177 Ky. 637, 198 S. W. 211, L. R. A. 1918 F, 673; Nourse v. City of Russellville, 257 Ky. 525, 78 S. W. (2nd) 761.

"The word 'slum,' harsh and objectionable to the aesthetic ear, has come to have a well-defined meaning, applicable to sections of almost every city or town of proportions. It is usually taken to mean, 'A squalid, dirty street or quarter of a city, town or village, ordinarily inhabited by the very poor, destitute or criminal classes; overcrowding is usually a prevailing characteristic. The word is comparatively recent and is of uncertain origin. It has been doubtfully connected with a dialectal use of the word 'slump' in the sense of a swampy, marshy place.' Ency. Br. 25, 246. Brewer, 'Phrase and Fable' says, 'Slums are purlius of Westminster Abbey & c. * * * where the derelict may obtain a night's lodging for a few pence.' Although the word may be of comparatively recent origin, the matter of properly housing persons living in unclean, unsanitary houses in congested portions of cities, has been a subject of public concern for many years. The importance of proper housing had received public recognition in England for more than 100 years; in 1909 it had reached considerable proportions. The motive was first purely philanthropic and

the objective was to improve the condition of the working classes. As early as 1841 there existed at least two societies, one the 'Metropolitan Association for Improving the Dwellings of the Industrial Classes.' These societies, after successfully operating for a time, found that from better housing the moral improvement was almost 'equal to the physical benefit.' Legislation looking to the same end soon followed and has at intervals continued to the present time. Encyc. Br. vol. 13, p. 815. The requirements of public health are indeterminate and interminable; as knowledge increases standards of living, of health, and of safety, constantly rise. It is the changing standard which gives most concern; housing at one period thought eminently satisfactory is presently condemned. In the present age, as in the past, material conditions of environment takes a leading position. These truths are recognized just as strongly in this, as in other countries which have outstripped ours in looking to the welfare of those whose conditions of life might be bettered by a more' healthful surrounding. Encyc. Br. under title 'Housing.' "

In the case of Wilmon v. Powell, 91 Cal. App. 1, 266 Pac. 1029, the Supreme Court of California had before it an Act, in many respects, similar to Chapter 17981, Laws of Florida, Acts of 1937, and that court in sustaining the California Act said, in part:

"Primarily, it is necessary to determine whether the objects and purposes of the housing commission are within the description of a public purpose. If the public nature of the enterprise is recognized, there remains little difficulty in accepting it as a municipal public purpose. In Veterans' Welfare Board v. Jordan, 180 Cal. 124, 208 P. 284, 22 A. L. R. 1515, the Supreme Court had before it for consideration the statute enacted for the purpose of creating a fund to carry on the operations of veterans' welfare board

which had been created to carry out the provisions of the Veterans' Welfare Act (St. 1921, p. 969). For the determination of the questions arising in that case, the court found it necessary to consider at length the field of judicial decision wherein it has been attempted to determine what is a public purpose. We refer to that case, beginning at page 141 (208 P. 284) thereof, without making extensive quotations here. Grounding its decision upon the liberal views of the courts to which it referred, our Supreme Court took into consideration the legislative assumption that the legislation in question tended to make 'for better citizenship, better notions of necessity for law and order, and a sounder and saner patriotism,' and concluded that the provisions of the statute authorizing a bond issue for the purpose of acquiring, subdividing, improving, acquiring water rights for, and selling the land so improved at cost, were valid as authorizing the expenditures of public money for a public purpose. If those observations were justified in that case, with equal reason it may be said that an enterprise of the kind contemplated by the charter provisions concerning the municipal housing commission, which has for its purpose the elimination of overcrowded tenements, unhealthy slums, and congested areas, thereby tending to ward off epidemics of disease and preserve the health of all of the inhabitants of a city, is a public purpose."

In the case of Simon v. O'Toole, 108 N. J. L. 32, 155 Atl. 449, the Supreme Court of New Jersey had before it Chapters 201 and 202, Laws of 1929, Laws of the State of New Jersey, and an ordinance adopted or enacted by the City of Newark providing for the acquisition of real estate in said city upon which was to be constructed modern housing facilities, thereby providing for the public health, safety and morals of certain citizens by removing unsafe and unsanitary buildings. The lower court sustained the ordinance

against a number of objections and the same was affirmed on appeal to the Supreme Court of New Jersey, when the following language was used:

"In this respect they resemble the well-known decision of our own Court of Errors and Appeals in Tide-Water Co. v. Coster, 18 N. J. Eq. 518, 90 Am. Dec. 634, in which the power of taxation had been exercised for reclaiming large tracts of meadow land. As to the purpose in view, Chief Justice Beasley said (page 521 of 18 N. J. Eq.): 'To make this vast region fit for habitations and use, seems to me plainly within the legitimate province of legislation; and to effect such ends, I see no reason to doubt that both the prerogatives of taxation and of eminent domain may be resorted to. * * * It is the resulting general utility which gives such enterprises a kind of public aspect, and invests them with privileges which do not belong to mere private interests.' The Chief Justice then goes on to illustrate the nature and define the extent of the principle that empowers the Legislature to determine what is a public use and to authorize the taking of private property for such use. He says (page 521 of 18 N. J. Eq.): 'It is one of the legislative prerogatives to decide the important question, whether an enterprise or scheme of improvements be of such public utility as to justify a resort, for its furtherance, to the exercise of the power of taxation or eminent domain. Primarily, the judiciary has no concern in such matter. And not only this, but if the public interest be involved, to any substantial extent, and if the project contemplated can, in any fair sense, be said to be promotive of the welfare or convenience of the community, the legislative adoption of such project is a determination of the question from which there is no appeal, and over which no other branch of the government has any supervision whatever.' And at page 523 of 18 N. J. Eq.: 'The object proposed, and for which

provision is made in the statute under review, being, then, one tending to the benefit of the community at large, must be regarded, upon principles which are too valuable to social interests to be disturbed, as coming exclusively under legislative control.' "

See State, *ex rel.* Porterie, Attorney General of Louisiana, v. Housing Authority of New Orleans, La. Sup., 182 So. 725, decided June 27, 1938; Anna M. Dorman v. The Philadelphia Housing Authority, Pa. Sup., 200 Atl. 834, decided at the June term, 1938, and unreported; Wells v. Housing Authority of Wilmington, 213 N. C. 744, 197 S. E. 693, decided June 15, 1938.

It is next contended that Section 12 of Chapter 17981, Acts of 1937, Laws of Florida, violates Section 12 of the Declaration of Rights of the Constitution of Florida and Section 29 of Article XVI of the Constitution of Florida. Section 12 of Chapter 17981, *supra,* provides:

"Section 12. EMINENT DOMAIN. — An authority shall have the right to acquire by the exercise of the power of eminent domain any real property which it may deem necessary for its purpose under this Act after the adoption by it of a resolution declaring that the acquisition of the real property, described therein is necessary for such purposes. An authority may exercise the power of eminent domain in the manner provided in Sections 3276 to 3295, both inclusive, Revised General Statutes of Florida, 1920, as amended by Chapters 15927 to 15928, Laws of Florida, Acts of 1933, and Acts amendatory thereof or supplementary thereto; or it may exercise the power of eminent domain in the manner provided by any other applicable statutory provisions for the exercise of the power of eminent domain. Property already devoted to a public use may be acquired in like manner, provided that no real property belonging to the

city, the County, the State or any political subdivision thereof may be acquired without its consent."

The right to appropriate private property for public use lies dormant in that State until legislative action is had pointing out the occasion, modes, conditions and agencies for its appropriation. Private property can be taken only pursuant to law; but a legislative Act declaring the necessity, being the customary mode in which that fact is determined, must be held to be for this purpose "the law of the land," and no other finding or adjudication can be essential, unless the Constitution of the State has expressly required it. Whenever action is had for this purpose, there must be kept in view that general as well as reasonable and just rule, that, whenever in pursuance of law the property of an individual is to be divested by proceedings against his will, strict compliance must be had or the proceedings will be ineffectual. See Cooley's Constitutional Limitations, Volume Two (8th Ed.) pages 1119-20; also Demeter Land Co. v. Florida Public Service Co., 99 Fla. 954, 128 So. 402; State, *ex rel.* Moody, v. Jacksonville, T. & K. W. R. Co., 20 Fla. 616; Wilson v. County of St. Johns, 98 Fla. 26, 123 So. 527; Isleworth Grove Co. v. County of Orange, 79 Fla. 208, 84 So. 83; Spafford v. Brevard County, 92 Fla. 617, 118 So. 451.

2. The second question for consideration is: Are the bonds or debentures issued by The Housing Authority of Jacksonville under the provisions of Chapter 17981, Laws of Florida, Acts of 1937, such obligations of the City of Jacksonville or Duval County as to require a vote of the freeholders thereof within the meaning of Amended Section 6 of Article IX of the Constitution of the State of Florida? The essential or material portions of the bonds or debentures to be issued by The Housing Authority of Jacksonville, Florida, are, viz.:

"No._____                              $_____

"United States of America
"State of Florida
"County of Duval

"The Housing Authority of Jacksonville, Florida
"Housing Revenue Debentures (First Issue)
"Series_____

"The Housing Authority of Jacksonville, Florida (hereinafter called the 'Authority'), a body corporate and politic organized under and by virtue of the laws of the State of Florida, acknowledges itself to owe and for value received hereby promises to pay, but only out of the special funds hereinafter mentioned, to the bearer, or, if this Debenture be registered as to principal as hereinafter provided, to the registered holder hereof, on the first day of _____, 1938 (unless this Debenture shall have been duly called for previous redemption and payment made or provided for, as provided in the Indenture herein referred to), the principal sum of _____ Dollars ($_____) and to pay interest on such principal sum, but only out of such special funds, from the date hereof, at the rate of _____percentum (____%) per annum semi-annually on the first day of June and the first day of December in each year until payment of such principal sum, but until maturity hereof only in accordance with and upon presentation and surrender of the respective interest coupons hereto attached as they severally mature, both the principal of and interest of this Debenture to be payable at the office of _____ in the City of Jacksonville, State of Florida, the Trustee under the Indenture hereinafter referred to, or, at the option of holder, at the principal office of _____ __in the Borough of Manhattan, City and State of New York, in such coin or currency as may

be, on the respective dates of payment thereof, legal tender for the payment of public and private debts.

"This Debenture is one of a series of debentures of the Authority known as 'Series_____' in the aggregate principal amount of _____Dollars ($_____) and, together with the 'Series_____' debentures of the authority in the aggregate principal amount of _____ Dollars ($_____) constitute an issue of Housing Revenue Debentures (First Issue) of the Authority in the aggregate principal amount of _____Dollars ($_____). The Housing Revenue Debentures (First Issue) both Series A and Series B, are herein referred to as the Debentures and the Issue. All Debentures of the Issue are issued pursuant to the provisions of the Constitution and laws of the State of Florida, particularly Chapter 17981, Act No. 275, General Laws of Florida, approved June 1, 1937 (known as the 'Housing Authorities Law') and Chapter 17983, Act No. 277, General Laws of Florida, approved June 1, 1937, and Resolution No. _____ of the Authority adopted on the _____ day of _____, 1938. Debentures of the Issue are also issued under, and secured by, an Indenture dated as of June 1, 1938 (herein called the 'Indenture') executed and delivered by the Authority to _____ of _____, Florida, (herein called the 'Trustee') as Trustee.

"This Debenture and all other Debentures of the Issue are special obligations of the Authority, payable solely from and secured by a first and exclusive pledge of and lien on the rents, revenues, fees and income of the Authority derived from or in connection with the administration of a low rent housing project, commonly known as 'Brentwood Park Housing Project,' located in Jacksonville, Florida, and from annual contributions payable to the Authority pursuant to a cetrain contract dated May 6, 1938, between

the Authority and the United States Housing Authority, all to the extent and in the manner more particularly described in the Indenture, to which Indenture reference is made for a description of the nature and extent of such pledge and the application of such rents, revenues, fees, income and annual contributions and of the security and rights of the holders of the Debentures with respect thereto and the terms and conditions upon which the Debentures are issued and secured. * * *

"The Debentures shall not be a debt of the City of Jacksonville, the County of Duval, the State of Florida, or any political subdivision thereof, and neither the City, the County, the State or any political subdivision thereof shall be liable thereon, nor in any event shall the Issue of which this Debenture is one be payable out of any funds or properties other than those of the Authority. The Issue of which this Debenture is one shall not constitute an indebtedness within the meaning of any constitutional or statutory debt or bond limitation or restriction. * * *

"IN WITNESS WHEREOF the Housing Authority of Jacksonville, Florida, has caused this Debenture to be executed in its name by its Chairman and the corporate seal of said Authority to be impressed hereon and attested by its Secretary, and the interest coupons hereto attached to be executed by the Facsimile signature of its Secretary, all as of the first day of _____, 19____.

"THE HOUSING AUTHORITY OF JACKSONVILLE, FLORIDA.

"By_____

"(SEAL)                                              "Chairman.

"ATTEST:

"_____

"Secretary."

Under Section 14 of Chapter 17981, Laws of Florida, Acts of 1937, the debentures and other obligations of an authority shall *not* be a debt of the city, the county, the State or any political subdivision thereof, and neither shall the city, county, etc., be liable thereon. The exact language of the section is as follows:

"Section 14. DEBENTURES. * * * An authority shall have power to issue debentures from time to time in its discretion, for any of its corporate purposes. An authority shall also have power to issue refunding debentures for the purpose of paying or retiring debentures previously issued by it. An authority may issue such types of debentures as it may determine, including debentures on which the principal and interest are payable; (a,) exclusively from the income and revenues of the housing project financed with the proceeds of such debentures, or with such proceeds, together with a grant from the Federal Government in aid of such project; (b) exclusively from the income and revenues of certain designated housing projects whether or not they were financed in whole or in part with the proceeds of such debentures; or (c) from its revenues generally. Any of such debentures may be additionally secured by a pledge of any revenues of any housing project, projects or other property of the authority.

"Neither the commissioners of an authority nor any person executing the debentures shall be liable personally on the debentures by reason of the issuance thereof. The debentures and other obligations of an authority (and such debentures and obligation shall so state on their face) shall not be a debt of the city, the county, the State or any political subdivision thereof, and neither the city or the county, nor the State or any political subdivision thereof shall be liable thereon, nor in any event shall such debentures or obligations be payable out of any funds or properties other

than those of said authority. The debentures shall not constitute an indebtedness within the meaning of any constitutional or statutory debt or bond limitation or restriction."

In the case of Hopkins v. Baldwin, 123 Fla. 649, 167 So. 677, the State Board of Control proposed to borrow $900,000.00 from the Federal Emergency Administration Public Works, giving as sole security therefor certain revenue certificates in the nature of limited debentures on the income and revenues to be derived by the obligor, State Board of Control, for "fees, rentals and other charges" from students, faculty members and others using or being served by or having a right to use, or having the right to be served, by certain dormitories and dining hall proposed to be constructed with the aforesaid borrowed money (supplemented by a 45 per cent. grant from the U. S. Government in aid of same) at the University of Florida and State College for Women and the school for colored people at Tallahassee. This Court held that Amended Section 6 of Article IX of the Constitution of Florida was inapplicable, and in part, said:

"Furthermore, the fees, rentals and other charges provided to be imposed and collected for the use of the proposed new buildings, will constitute a proprietary fund *in esse* from the very moment the new buildings are constructed and put into use, and therefore may be anticipated and funded in the form of revenue anticipation certificate debentures in like manner as the water revenues considered and dealt with in the case of State v. City of Miami, 113 Fla. 280, 152 Sou. Rep. 6, and in Board of County Commissioners of Pinellas County, 123 Fla. 619, 167 So. 386, were held to be fundable in the form of revenue anticipation certificates that do not involve nor contemplate the obligation of any part whatever of the State's sovereign rev-

enue raising powers in order to make them effectual and complete for the purposes for which they are provided to be issued, and which do not amount to a mortgage or lien or any charge whatever upon any physical property or franchise held, owned or inuring to the benefit of the State or any of its political subdivisions or agencies.

Upon the considerations aforesaid, and upon the authority of Board of County Commissioners of Pinellas County v. Herrick, *supra* (123 Fla. 619, 167 So. 386) and the several authorities therein cited, we hold that neither Chapter 16981, Acts of 1935, *supra,* nor the Resolution adopted by the State Board of Control as hereinbefore quoted and referred to, will result in the creation of any illegal bonded or other debt of the State of Florida in violation of Amended Section 6 of Article IX of the State Constitution, and that therefore the Chancellor below committed no error in denying the injunction prayed for in appellant's bill of complaint."

In the case of State and Diver v. City of Miami, 113 Fla. 280, 152 So. 6, this Court had before it the same question as is now under consideration, and in deciding it said:

"So the substance of what we decide in this case is that the contemplated certificates of indebtedness issued, or to be issued, by the City of Miami, which are payable out of the income of proprietary municipal property possessing a fixed earning capacity, to-wit: a municipal water plant, which said property is to be repaired, reconstructed and improved for the necessary preservation of the facilities of the plant, as well as the incidental protection of the public health and public safety, out of the proceeds derived from the sale of such certificates, and which certificates, according to their express phraseology, and according to the statutes and ordinances under which they are authorized and issued, are payable as to both principal and

interest solely out of the net earnings derived from the operation of said municipal water plant, which constitutes a net revenue derived and to be derived solely from the sale of water, and which certificates do not create, nor purport to create, a general obligation upon, or debt against, the city, and cannot be enforced or collected by levy of an *ad valorem,* or other municipally imposed tax upon property or business transactions situated, or carried on within said City of Miami, or make a charge of any kind upon the property of taxpayers, or upon the tax resource of the City of Miami, are not municipal bonds within the purview of Section 6, of Article IX of the Constitution of the State of Florida, as amended in 1930, nor are they 'debts' of the city within the purview of the city's statutory debt limit. Such water revenue certificates are not held to be so exempt from the restrictions of the Constitution because they are designated as 'Certificates' instead of 'bonds,' but because of the nature of the actual obligations created thereby, and the manner in which payment is to be made and enforced, as hereinbefore stated."

See State v. City of Miami, 113 Fla. 280, 152 So. 6; State v. City of Lake City, 116 Fla. 10, 156 So. 924; State v. City of Daytona Beach, 118 Fla. 29, 158 So. 300; Wilson v. City of Bartow, 124 Fla. 356, 168 So. 545; State v. City of Clearwater, 124 Fla. 354, 168 So. 546; State v. City of Punta Gorda, 124 Fla. 512; 169 So. 835; Leon County v. State, 122 Fla. 505, 165 So. 666; Tapers v. Pichard, 124 Fla. 549, 169 So. 39; Roach v. City of Tampa, 125 Fla. 62, 169 So. 627; Boyking v. Town of River Junction, 124 Fla. 827, 169 So. 492; State, *ex rel.* City of Vero Beach, v. MacConnell, Number 1, 125 Fla. 130, 169 So. 628.

The record shows that The Housing Authority of Jacksonville, Florida, pursuant to Chapter 17981, Laws of Florida, Acts of 1937, was organized; that The Housing Au-

thority of Jacksonville, Florida, was organized pursuant to the terms and provisions of said Act by the Mayor of the City of Jacksonville, after resolution duly passed by the City Council and City Commission of said City; that pursuant to its organization, The Housing Authority of Jacksonville, Florida, did select a site for a municipal low-cost housing project, and did authorize action to be taken for the acquisition of land and for a survey of slum and housing conditions in said City; that for the purpose of obtaining capital to undertake and complete said project, The Housing Authority of Jacksonville, Florida, entered into a loan contract with the United States Housing Authority, whereby it was provided that the said U. S. H. A. would lend to The Housing Authority of Jacksonville the sum of One Million Twenty-seven Thousand ($1,027,000.00) Dollars, said amount being 90% of the estimated cost of said project, and said Authority therein agreed to issue debentures or bonds in the sum of $1,027,000.00 to be purchased by the U. S. H. A. for the purpose of retiring the indebtedness represented by said loan; that the said Authority further proposes to issue bonds in the sum of $125,000.00 for the purpose of sale to local investors, which said bond issue of $125,000.00 represents the remaining ten per cent. of the cost of said project; that the said Authority has further entered into a contract with the U. S. H. A. wherein and whereby the U. S. H. A., throughout the entire period of sixty years, during which the bonds of said Authority are to be amortized, will make to the said Authority, annual contributions in the sum of $43,924.00 per annum, said grant to be used as a part of a retirement or sinking fund, and to be applied from time to time to the discharge of the principal and interest of said bonds; that pursuant thereto, the said Authority has further entered into a contract with the City of Jacksonville providing for the elimination of un-

safe or insanitary dwelling units in the City of Jacksonville, equal in number of units to be constructed in said low-cost housing project; and it further entered into a separate contract with the City of Jacksonville, wherein and whereby the said City agreed to furnish certain services to the Authority at certain rates therein set forth, in connection with the development of said low-cost housing project; that said U. S. H. A. has further agreed to advance to the Authority the sum of $80,000.00 for purposes of paying preliminary expenses in connection with the development of said project, and the Authority has, by resolution, authorized issuance of its note or notes in the aggregate principal amount of not to exceed $85,000.00 for said purposes.

Chapter 17981, *supra*, creates or establishes a corporation known as The Housing Authority. It has been granted power so that its objectives may be accomplished, viz.: the clearance of slums and the eradication of slum evils in the different areas of Florida, and to erect in their places low-cost houses so that persons with low incomes can be more abundantly cared for and the attendant evils of slum conditions reduced to a minimum. We have examined the loan contract dated May 6, 1938, between The Housing Authority of Jacksonville, Florida, and the United States Housing Authority; the annual contribution contract dated May 6, 1938, between The Housing Authority of Jacksonville, Florida, and the United States Housing Authority; the form of the Housing Revenue Debenture of The Housing Authority of Jacksonville, Florida; the agreement between the City of Jacksonville, Florida, and The Housing Authority of Jacksonville, Florida; and the Co-operation Agreement between the City of Jacksonville, Florida, and The Housing Authority of Jacksonville, Florida. We hold that each of these agreements are legal and binding obli-

gations and each within the powers conferred by Chapter 17981, *supra,* on The Housing Authority of Jacksonville, Florida; that the bonds or debentures of The Housing Authority of Jacksonville, Florida, when issued, will be the debt or obligation of The Housing Authority of 'Jacksonville, Florida, and not the debt or obligation of the City of Jacksonville, a municipal corporation, or the County of Duval, or the State of Florida; and that the bonds or debentures of The Housing Authority of Jacksonville, Florida, are not bonds within the meaning of Amended Section 6 of Article IX of the Constitution of Florida, and a vote of the freeholders is not necessary.

3. The third and last question for decision here is: Is the real and personal property of The Housing Authority, Jacksonville, Florida, owned and held under Chapter 17981, *supra,* exempt from all *ad valorem* taxes? The claim of exemption here is based on Chapter 17983, Laws of Florida, Acts of 1937, and the following described portion thereof: "that such housing projects (including all property of a housing authority used for or in connection therewith or appurtenant thereto) are exclusive public uses and municipal purposes and not for profit, and are governmental functions of State concern. As a matter of legislative determination, it is hereby found and declared that the property and debentures of a housing authority are of such character as may be exempt from taxation." If Chapter 17981, *supra,* does not violate Section 1 of Article IX of the Constitution of Florida, then all property owned by a housing authority is exempt from all *ad valorem* taxes. If Chapter 17893, *supra,* contravenes Section 1 of Article IX of the Constitution of Florida, then it is void and *ad valorem* taxes are assessable and collectible. Section 1 of Article IX provides:

"Section 1. The legislature shall provide for a uniform rate of taxation, except that it may provide for special rate

or rates on intangible property, but such special rate or rates shall not exceed five mills on the dollar of the assessed valuation of such intangible property, which special rate or rates, or the taxes collected therefrom, may be apportioned by the Legislature, and shall be exclusive of all other State, County, district and municipal taxes; and shall prescribe such regulations as shall secure a just valuation of all property, both real and personal, excepting such property as may be exempted by law for municipal, education, literary, scientific, religious, or charitable purposes."

It will be observed that Chapter 17983 declared that all property owned by a housing authority are to be held and used exclusively as public uses and not for profit and are governmental functions of State Concern, and exempt from *ad valorem* taxes. The first division of Section 897, C. G. L., exempts all property of the United States and State of Florida from taxation. The second division of Section 897 exempts all property of the counties, cities, villages, towns and school districts of Florida *used or intended for public purposes*. This opinion holds that The Housing Authority of Jacksonville, Florida, is a public purpose. Chapter 17983, *supra*, is a declaration of the Legislature that the property of a housing authority should be classed and regarded as a public purpose of State concern. The Housing Authority of Jacksonville, Florida, is a public body, corporate and politic, and is given perpetual succession. Its purpose is limited to the clearance of slums and the construction of low-cost houses to be used by persons of low incomes, thereby advancing the health, moral and general welfare of the people. It was clearly the intention of the Legislature by enacting Chapter 17983, Laws of Florida, Acts of 1937, that the property of a housing authority would be exempt from all *ad valorem* taxes. Legislation passed by the Legislature of other states and sim-

ilar to Chapter 17983, *supra,* and having tax provisions in their Constitutions very much like the State of Florida, has been by the Supreme Courts of the several states sustained on the theory of a public purpose of state concern. The Legislature of Florida had the power to enact Chapter 17983, *supra.* See Spahn v. Stewart, *supra;* Wells v. Housing Authority of Wilmington, *supra;* State, *ex rel.* Por*terie,* Attorney General, v. Housing Authority of New Orleans, *supra;* Anna M. Dorman v. The Philadelphia Housing Authority, *supra.* See also Cooley's Constitutional Limitations, Volume Two (8th Ed.) pages 1086-7.

The order made and entered by the Chancellor below sustaining the separate motions of the defendants to dismiss the bill of complaint was proper and free from error. The order of dismissal appealed from is hereby affirmed. It is so ordered.

ELLIS, C. J., and WHITFIELD and BUFORD, J. J., concur.

BROWN, J., concurs in part and dissents in part.

BROWN, J. (dissenting in part).—I concur in this opinion with the exception of one point; that is, that the legislative Act, exempting the property of the Housing Authority from taxation, is a valid exemption. This exemption from ad valorem taxes is not, in my opinion, within the power of the Legislature under Section 1 of Art. IX of the Constitution. Otherwise I concur.