[L. A. No. 17273. In Bank.—October 11, 1939.]

THE HOUSING AUTHORITY OF THE COUNTY OF LOS ANGELES, Petitioner, v. ISIDORE B. DOCK-WEILER, Chairman of Housing Authority, etc., Respondent.

J. H. O'Connor, County Counsel, and Beach Vasey and Edward H. Gaylord, Deputy County Counsel, for Petitioner.

John J. O'Toole, City Attorney (San Francisco), William A. O'Brien, Deputy City Attorney, Faries & McDowell, Leonard S. Janofsky, and Bernard J. Abrott, as *Amici Curiae,* on Behalf of Petitioner.

Roscoe R. Hess for Respondent.

C. M. Walter, Elson Jones, Hugh K. McKevitt, Joseph F. DeMartini, Scott & Eberhard, Mary A. Flor, Barry Sullivan and Ray C. Eberhard, as *Amici Curiae,* on Behalf of Respondent.

SHENK, J.—In this proceeding for a writ of *mandamus,* petitioner, The Housing Authority of the County of Los

Angeles, seeks to compel the respondent, its chairman, to perform certain duties alleged to be enjoined upon him by law. The cause is presented on general demurrer, respondent basing his refusal to act upon the asserted unconstitutionality of the statute under and by virtue of the provisions of which the petitioner was created and vested with power.

In order to properly consider and determine the issues involved in this proceeding it is necessary that some reference be made to the legislative background to which the petitioning authority traces its existence. It appears that congress enacted what is known as the United States Housing Act of 1937 (42 U. S. C. A., secs. 1401–1430) and declared therein that it is "the policy of the United States to promote the general welfare of the nation by employing its funds and credit, as provided in this chapter, to assist the several states and their political subdivisions to alleviate present and recurring unemployment and to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe and sanitary dwellings for families of low income, in rural or urban communities, that are injurious to the health, safety, and morals of the citizens of the Nation." Pursuant to this declaration of policy, the remaining sections of the chapter set up a plan or method of slum clearance and erection of low-rent dwellings in their place and stead. Generally, the act provides that dwellings in low-rent housing projects shall be available solely for families whose net income at the time of admission thereto does not exceed five times the rental thereof, including the value or cost to them of heat, light, water and cooking fuel, except that in families with three or more minor dependents, such ratio shall not exceed six to one. To accomplish the announced objective there is set up in the department of interior a body corporate of perpetual duration to be known as the United States Housing Authority, which is declared to be an agency and instrumentality of the United States. The authority so created is authorized to make loans to public-housing agencies of the several states or their political subdivisions with a view to assisting in the development, acquisition or administration of low-rent housing or slum-clearance projects. In no event shall such loans exceed ninety per cent of the development or acquisition cost of a project. It is provided that annual contributions, authorized

for the purpose of assisting local public-housing agencies in achieving and maintaining the low-rent character of projects, shall not be made available to a project ''unless and until the state, city, county, or other political subdivision in which such project is situated shall contribute, in the form of cash or tax remissions, general or special, or tax exemptions, at least 20 per centum of the annual contributions . . . '' The act provides for a contract guaranteeing payment of such annual contributions over a fixed period but precludes such contributions or execution of a contract guaranteeing same in the case of a low-rent-housing or slum-clearance project calling for the construction of new dwellings ''unless the project includes the elimination by demolition, condemnation, and effective closing, or the compulsory repair or improvement of unsafe or insanitary dwellings situated in the locality, or metropolitan area, substantially equal in number to the number of newly constructed dwellings provided by the project'', except that such elimination may be deferred where there is an acute shortage of livable dwellings. Such annual contributions are to be applied first toward payment of the principal or interest on any loan due to the authority by the local housing agency. If shown to be better suited to a project than annual contributions thereto, an alternative method of assistance is provided in the form of capital grants which are not to exceed 25 per cent of the development or acquisition cost of a project and which are not to be made unless and until provision is made substantially as already mentioned by the political subdivision wherein the project is situated for demolition, etc., of an equal number of unsafe and insanitary dwellings and for the granting by the political subdivision of cash, land, or the value of community services or facilities for which a charge is usually made, or tax remissions or exemptions in an amount not less than 20 per cent of the development or acquisition cost of the project. In order to insure the low-rent character of the project it is provided, among other things, that no contract for any loan, annual contribution or capital grant shall be entered into with respect to any project costing more than $4,000 per family-dwelling-unit or more than $1,000 a room (excluding land, demolition and nondwelling facilities). In the case of cities with a population in excess of 500,000 the amounts are fixed at $5,000 per family-dwelling-unit or $1250 a room.

To achieve the purpose of the act the authority is authorized to issue obligations in the form of notes or bonds in an amount not to exceed $800,000,000 and maturing not to exceed sixty years from date of issuance.

In order to make the benefits of the federal statute available to this state and its political subdivisions and in order to eliminate, wherever possible, insanitary and unsafe dwelling accommodations and to replace them with modern and livable low-rent dwellings, the legislature of this state at the special session of 1938 enacted what is known as the Housing Authorities Law. (2 Deering's Gen. Laws Supp., Act 3483.) In its early provisions there appears a declaration of the existence in this state of insanitary and unsafe dwelling accommodations in which those of low income are required to reside because of a shortage of livable low-rent dwellings. Such condition, with its consequent overcrowding and congestion, is declared to cause an increase in and spread of disease and crime which, in turn, are declared to constitute a menace to the health, safety, morals and welfare of the residents of the state necessitating excessive and disproportionate expenditures of public funds for crime prevention and punishment, public health and safety. It is also declared that the clearance, replanning and reconstruction of such areas are public or governmental uses and purposes for which public money may be spent and that the same is not competitive with private enterprise because of the latter's inability to cope with or to overcome such conditions.

To accomplish its objective, the act thereupon creates in each city and in each county of the state "a public body corporate and politic to be known as the 'housing authority' of the city or county" which authority, however, is not to transact any business or exercise the powers granted to it under the act unless and until the governing body of the city or county, as the case may be, by proper resolution declares the need for such an authority to function therein. Upon the adoption of such resolution by a city, it is provided that the mayor shall appoint five persons as commissioners of the authority who serve without compensation and receive only their expenses in connection therewith. In the case of a county resolution declaring the necessity for a housing authority, the governing body or board of supervisors shall appoint the five commissioners. An authority

so created is given power to investigate living conditions in its area; to sue and be sued; to prepare and carry out, acquire, lease, operate, construct, reconstruct, improve, repair, or alter housing projects within its area of operation; to arrange or contract for the furnishing by any person or agency of services, works or facilities for or in connection with a housing project; to provide in any contract for compliance with any conditions which the federal government may have attached to its financial aid of the project; and to own, hold, lease and improve real and personal property. It is declared that projects are not to be operated for profit and the rents are to be fixed at the lowest possible figure consistent with the furnishing of decent, safe and sanitary dwellings. In conformity with the federal act, it is provided that such low-rent dwellings may be rented only to persons of low income and whose annual income does not exceed five times the annual rental of the dwelling, including in the latter the annual average cost of heat, water, electricity, gas and other necessary facilities. As to families having three or more minor dependents, the ratio is increased to six to one, as authorized in the federal act. The act confers upon local housing authorities the right to acquire by eminent domain such property as is necessary to their low-rent dwelling projects. All of the property of such authorities is made subject to the planning, zoning, sanitary and building laws applicable to the particular locality.

Section 14 of the act confers upon the authorities therein created the right to issue bonds and refunding bonds from time to time in their discretion for any of their corporate purposes. Bonds so issued may be of the type on which the principal and interest are payable (a) exclusively from the income and revenues of the housing project financed with the proceeds of such bonds or with such bond proceeds and a grant of federal aid; or (b) exclusively from the income and revenues of certain housing projects whether financed by said bonds or not; or (c) from the authority's revenues generally. It is also provided that such bonds may be additionally secured by a pledge of any revenues or a mortgage of one or more projects or other property of the authority. It is declared that neither the commissioners nor any person executing the bonds shall be personally liable thereon. It is further provided that the bonds and other

obligations of an authority (and they shall so declare on their face) shall not be a debt of the city, the county, the state or any political subdivision thereof and none of such entities shall be liable thereon, the same being payable only out of the funds or property of the authority issuing them. The act unequivocally declares that such bonds shall not constitute an indebtedness within the meaning of any constitutional or statutory debt limitation or restriction. The issuance of bonds may be authorized by resolution of the authority and may be issued in one or more series and have such dates, denominations, maturity, interest rate (not to exceed $4\frac{1}{2}$ per cent), priority, and may be payable in such manner or medium as the resolution, trust indenture or mortgage may provide. They are declared to be fully negotiable and may be sold at public sale, after publication, at not less than par, except that they may be sold to the federal government at not less than par at private sale without prior publication. The act declares that in any suit involving the validity or enforceability of any bond, a recital therein that it was issued to aid in financing a housing project shall give rise to a conclusive presumption that the bond had been issued for said purpose and it shall be conclusively presumed that the project was planned, located and constructed in accordance with the provisions of the act.

All real property of the authority is declared to be exempt from levy and sale by way of execution but an obligee of an authority may pursue his remedies on any mortgage or pledge executed by the authority. The authorities created by the act are empowered to borrow money or accept grants from the federal government for and in aid of their housing projects and may take over, lease, etc., any federal housing project in their area of operation. In addition to other matters not here necessary to mention, the act concludes with the usual severability and urgency clauses.

To foster the purposes of the foregoing act, the legislature at the same session enacted the Housing Cooperation Law (2 Deering's Gen. Laws Supp., Act 3484) wherein it is declared that it is a proper public purpose for any state public body to aid any housing authority operating within its boundaries or jurisdiction and that in furtherance of such aid any public body may upon such terms, with or without consideration, as it may determine, dedicate, sell, convey or

lease any of its property to a housing authority or the federal government; furnish facilities (water, recreational, etc.) otherwise furnished by it; dedicate, pave, zone and rezone streets; purchase or invest in housing authority bonds; and may appropriate as a loan or donation the money necessary for the administrative expense of the authority during the first year of its existence.

There was also enacted by the legislature at the same session an act (Deering's Gen. Laws Supp., Act 3485) which, after proclaiming the existence of unsafe and insanitary dwellings and the public purpose underlying their elimination as contemplated in the preceding two acts, declared that all property of housing authorities ''shall be exempt from all taxes and special assessments'' of the state or of any political subdivision thereof, provided, however, ''that in lieu of such taxes or special assessments a housing authority may agree to make payments [to any political subdivision] for services, improvements or facilities furnished [by such political subdivision] for the benefit of a housing project owned by the housing authority'', not to exceed the estimated cost of such services, improvements or facilities. The act also provides that ''the bonds of a housing authority are declared to be issued for an essential public and governmental purpose and, together with interest thereon and income therefrom, shall be exempt from all taxes''.

In concluding the legislative history underlying this litigation, it is well to point out that the legislature at the same special session also amended section 1238 of the Code of Civil Procedure by adding thereto subdivision 21 which enumerates the erection of housing projects as a purpose for which the power of eminent domain may be exercised.

■ The Housing Authority of the County of Los Angeles, petitioner herein, was created and authorized to transact business in compliance with the provisions of the state statute. In this connection, it should be stated that the fact that its right to transact business and to exercise the powers granted to it under the statute were dependent upon action of the county board of supervisors, is not fatal to its existence. It has been recognized that the local operation of an act of general state-wide scope may be made contingent upon determination by the local authorities that conditions there require its acceptance and operation. (*Board of Law Lib. Trus-*

*tees* v. *Board of Supervisors*, 99 Cal. 571, 573 [34 Pac. 244] ;
*Davis* v. *County of Los Angeles*, 12 Cal. (2d) 412 [84 Pac.
(2d) 1034].) In discharge of its functions and on September
6, 1938, petitioner entered into a contract with the county
whereby the latter agreed to eliminate unsafe and insanitary
dwellings at least equal to the number of new dwellings to
be provided in the low-rent housing projects to be developed
by petitioner. At its regular meeting held on December 14,
1938, the petitioner by the affirmative vote of four of its five
members, one being absent, adopted a resolution approving a
loan contract between it and the United States Housing Au-
thority and authorizing and directing its chairman, respond-
ent herein, to execute the same on its behalf. Among other
things, the contract, as amended, provided that the United
States Housing Authority agreed to assist the petitioner in
the development of a described low-rent housing project in
the county of Los Angeles consisting of substantially 606
dwelling units by purchasing bonds of the petitioner, which
the latter agreed to sell, in the aggregate principal amount
of $2,331,000, but not to exceed in any event 90 per cent
of the development cost of the project. The contract fur-
ther provided that upon request of the petitioner, and upon
a satisfactory showing of the necessity therefor, the United
States Housing Authority for certain preliminary expenses
incidental to the project might make advances on account of
the agreed loan upon receipt from petitioner of evidences of
indebtedness exchangeable for an equal principal amount of
bonds when issued by petitioner. In due course, this con-
tract was executed by the United States Housing Authority
and The Housing Authority of the County of Los Angeles,
petitioner herein. Thereafter, however, the respondent, as
chairman of petitioner, refused to execute a duly authorized
note which, pursuant to the terms of the aforesaid loan con-
tract, was intended to serve as evidence of petitioner's in-
debtedness to the United States Housing Authority for cer-
tain advances on the loan contemplated by said contract,
and which advances were essential to carry on certain pre-
liminary work of the proposed project. The note was a
demand note in the principal amount of $10,000, bearing
interest at 3 per cent. It provided that the holder thereof
could demand payment in cash or could accept, in exchange
therefor, an aggregate principal amount of definitive bonds

of the petitioner when issued. On its face the note indicated that it was issued in furtherance of a low-rent housing project of petitioner and it expressly declared, in conformity with the statute, that it was not a debt of the county of Los Angeles or of the State of California or of any political subdivision thereof and that said entities should not be liable thereon. It was further declared that in any event the note should not be payable out of any funds or property other than those of the petitioning housing authority, a first lien therefor being impressed upon all of petitioner's revenues. Also in conformity with the provisions of the statute, the note was declared not to be an indebtedness ''within the meaning of any constitutional or statutory debt limitations or restrictions''.

As stated at the beginning of this opinion, respondent's refusal, as chairman, to execute this note for and on behalf of petitioner was based solely upon the asserted unconstitutionality of our statutes, *supra,* which created and empowered petitioner and other similar · local housing authorities for the purpose of slum-clearance and construction of safe and sanitary low-rent dwellings for persons of low income. Respondent's attack upon said statutes is many-sided and, in the main, follows closely the assaults that have been made in other jurisdictions upon statutes of similar import and purpose. In this connection, it is interesting to note that thirty-two states, desiring to avail themselves of the aid proffered by the federal statute, *supra,* have enacted legislation substantially identical with ours. It is also of significance that whenever and wherever such statutes have been challenged (thirteen or fourteen jurisdictions in all) they have been fully sustained as against onslaughts similar in character to those here urged. Such statutes have been held to be constitutional in the following jurisdictions:

Alabama—*Re Opinion of the Justices,* 235 Ala. 485 [179 So. 535] (Mar. 17, 1938);

Florida—*Marvin* v. *Housing Authority of Jacksonville,* 133 Fla. 590 [183 So. 145] (July 27, 1938);

Georgia—*Williamson* v. *Housing Authority of Augusta,* 186 Ga. 673 [199 S. E. 43] (Sept. 21, 1938);

Illinois—*Krause* v. *Peoria Housing Authority,* 370 Ill. 356 [19 N. E. (2d) 193] (Jan. 26, 1939);

Indiana—*Edwards* v. *Housing Authority of City of Muncie,* (Ind.) 19 N. E. (2d) 741 (Mar. 13, 1939) ;

Kentucky—*Spahn* v. *Stewart,* 268 Ky. 97 [103 S. W. (2d) 651] (Mar. 26, 1937) ;

Louisiana—*State* v. *Housing Authority of New Orleans,* 190 La. 710 [182 So. 725] (June 27, 1938) ;

Montana—*Rutherford* v. *City of Great Falls,* 107 Mont. 512 [86 Pac. (2d) 656] (Jan. 21, 1939) ;

Montana—*State* v. *City of Helena,* (Mont.) 90 Pac. (2d) 514 (May 10, 1939) ;

New York—*New York Housing Authority* v. *Mueller,* 270 N. Y. 333 [1 N. E. (2d) 153, 105 A. L. R. 905] (Mar. 17, 1936) ;

North Carolina—*Wells* v. *Housing Authority of Wilmington,* 213 N. C. 744 [197 S. E. 693] (June 15, 1938) ;

Pennsylvania—*Dornan* v. *Philadelphia Housing Authority,* 331 Pa. 209 [200 Atl. 834] (June 30, 1938) ;

South Carolina—*McNulty* v. *Owens,* 188 S. C. 377 [199 S. E. 425] (October 13, 1938)`;

Tennessee—*Knoxville Housing Authority* v. *City of Knoxville,* 174 Tenn. 76, 123 S. W. (2d) 1085 (Jan. 21, 1939) ;

West Virginia—*Chapman* v. *Huntington W. Va. Housing Authority,* (W. Va.) 3 S. E. (2d) 502 (June 13, 1939).

 It must be admitted that the questions involved in this litigation are of great public concern and importance. While there are a number of issues presented, the one of fundamental importance, and upon the determination of which several of the lesser and incidental issues will turn, is whether slum clearance and public housing projects for low-income families are public uses and purposes for which public money may be expended and private property acquired. Preliminarily, it should be recalled that the federal statute and our state statutes are premised upon the expressly declared policy that elimination of substandard dwellings and the providing in their place and stead of safe and sanitary dwellings of low rental for those otherwise required by lack of income to remain in the substandard dwellings are public uses and purposes and are governmental functions of state concern. While such a declaration of policy by the legislative branch of the government is not necessarily binding or conclusive upon the courts, it is entitled to great

weight and it is not the duty or prerogative of the courts to interfere with such legislative finding unless it clearly appears to be erroneous and without reasonable foundation. (*Levy Leasing Co. v. Siegel,* 258 U. S. 242, 246 [42 Sup. Ct. 289, 66 L. Ed. 595]; *Block v. Hirsh,* 256 U. S. 135, 154 [41 Sup. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165]; *Oklahoma City v. Sanders,* 94 Fed. (2d) 323, 326 [115 A. L. R. 363]; *McNulty v. Owens, supra,* 428; *Spahn v. Stewart, supra,* 656; *N. Y. City Hsg. Auth. v. Mueller, supra; Rutherford v. City of Great Falls, supra,* 658. However, aside from the respect to be accorded the legislative declaration of the public purpose underlying the statutes here challenged, it is our view, and we are satisfied that both reason and authority support us, that the proposed elimination of slums and the erection of safe and sanitary low-rent dwelling units for persons of the prescribed restricted income will do much to advance the public welfare and to protect the public safety and morals and are in fact and law public purposes. Through the projects contemplated by the above statutes elimination of insanitary and unhealthful conditions is brought about by clearing premises of unfit dwelling buildings, and removing the degrading and unwholesome conditions existing in such surroundings, thereby reducing or preventing disease and crime and aiding and benefiting the health, morals and safety of the community. The United States Supreme Court in *Rindge Co. v. County of Los Angeles,* 262 U. S. 700 [43 Sup. Ct. 689, 67 L. Ed. 1186], declared that ''Public uses are not limited, in the modern view, to matters of mere business necessity and ordinary convenience, but may extend to matters of public health, recreation and enjoyment''.

In our determination that the type of statute here involved concerns a public purpose, we find support not only in the authorities of other jurisdictions but also in *Willmon v. Powell,* 91 Cal. App. 1 [266 Pac. 1029], wherein in 1928, long prior to the enactment of the legislation involved in the present case, it was held that the creation of a municipal housing commission for the purpose of eliminating overcrowded tenements, unhealthful slums and congested areas, thereby tending to ward off disease and preserve the public health, constituted a public purpose and municipal affair. There, as here, it was substantially urged, but without avail, that the undertaking resembled a commercial enterprise

rather than a public use or function. Among other things, it was there stated that ''The fact that in the course of administration of the commission, private persons will receive benefit, as tenants or otherwise, of houses constructed by the commission, is not sufficient to take away from the enterprise the characteristics of a public purpose''. (See, also, *Veterans' Welfare Board* v. *Jordan*, 189 Cal. 124, 145 [208 Pac. 284, 22 A. L. R. 1515].)

Turning now to the decision of other jurisdictions passing upon the validity of statutes creating and empowering housing authorities for purposes of slum-clearance and erection of low-rent dwelling projects, and which statutes are practically identical with those of this state here brought into question, we find that they are in unanimous accord upon the proposition that the purpose underlying such legislation is unquestionably governmental and public in character. These decisions are cited at length above. It would be repetitious to quote from all of them. We quote but two. The views and reasoning underlying all of such cases are reflected in *Spahn* v. *Stewart, supra,* 657, where in rejecting the assaults of certain taxpayers and owners of rentable property upon the Kentucky statute creating and empowering municipal housing commissions possessing substantially the powers invested in the petitioner here, the court declared that ''The use here proposed, as argued by appellee and admitted by appellants, may be more beneficial in the way of direct aid to a particular class, but it also operates to the benefit of the general public and its welfare. The act limits the ultimate use of the improved property to such persons as may be selected to occupy. This does not brand the purpose as class or special legislation. Whether or not the persons chosen to occupy are to be ultimately benefited more than those who are not, is a sociological question because of differing circumstances. Who can say that in the long run those who live in sumptuous residences environed by the elite may not account themselves still more blessed, if by improved conditions of housing in another section they are relieved from the probabilities or possibilities of an epidemic of smallpox, typhoid fever, or other diseases, or that they may sleep more serenely because of a lessened fear of the commission of crime against their persons or property. 'The essential purpose of the legislation is not to benefit that class or any class;

it is to protect and safeguard the entire public from the menace of the slums. . . . The fact that all individuals may not be elected to occupy the reconditioned premises is not material. A power plant, because of limited equipment, may not be able at all times to serve all the public but it is none the less rendering public service. It is not essential to the validity of the proposal that all the public reap like direct benefits. . . . The fact that those who may ultimately occupy the premises may have a preference is immaterial. . . . It is not material that some reap more benefit than others. . . . Nor is the government competing with private enterprise . . . '' To the same effect is *Knoxville Housing Authority* v. *City of Knoxville, supra,* 1087, wherein it appears: ''The courts reason that the primary object of all government is to foster the health, morals and safety of the people. That slum districts with their filthy, congested, weather-exposed living quarters are breeding places of disease, immorality and crime. The character of the houses in such districts make of them a fire hazard. The existence of such districts depresses the taxable value of neighboring property and deprives the state of revenue. The State is also put to great expense in combating disease, crime and conflagration originating in such localities. They menace not only the health, safety and morals of those living therein, but since disease, crime, immorality and fires can with difficulty be confined to points of origin, these districts are a menace to the whole community—indeed, a menace to the State.'' See, also, *Green* v. *Frazier,* 253 U. S. 233 [40 Sup. Ct. 499, 64 L. Ed. 878], where, among other things, it is declared that ''With the wisdom of such legislation, and the soundness of the economic policy involved we are not concerned. Whether it will result in ultimate good or harm it is not within our province to inquire.'' As stated, we are satisfied that the statutes of this state creating and empowering housing authorities for the purpose of slum clearance and erection of low-cost housing projects represent the exercise of a proper governmental function for a valid public purpose.

Our determination that the use to which such housing projects are devoted is a public one, necessarily answers the contention addressed to the exercise of the right of eminent domain by the authorities created to carry on such projects. Investing petitioner and similar authorities with the right

of eminent domain does no violence to either the state or federal Constitution, assuming just compensation be made to owners. Section 1237 of the Code of Civil Procedure declares that "Eminent domain is the right of the people or government to take private property for public use". The public purpose served by the petitioner and other local housing authorities warrants the grant of such right to them. (*University of So. Cal.* v. *Robbins,* 1 Cal. App. (2d) 523 [37 Pac. (2d) 163], *certiorari* denied in U. S. Supreme Court, 295 U. S. 738 [55 Sup. Ct. 650, 79 L. Ed. 1685] ; *Fallbrook Irr. Dist.* v. *Bradley,* 164 U. S. 112, 161 [17 Sup. Ct. 56, 41 L. Ed. 369].) Such is the unanimous holding of the several decisions from other jurisdictions above cited wherein similar housing statutes were involved. The point is succinctly disposed of in *Williamson* v. *Housing Authority of Augusta, supra,* as follows: "If the use is a public use, the power of eminent domain conferred by the act is legitimate."

 Nor can we find any meritorious constitutional objection against the expressed statutory exemption of the real and personal property of housing authorities from state, county and local taxation. Among other things, section 1 of article XIII of the state Constitution exempts from taxation property belonging to "this state, or to any county, city and county, or municipal corporation within this state". Section 4 of the Housing Authorities Law, *supra,* defines an authority as "a public body, corporate and politic". Such an authority is not unlike an irrigation district which, though held not to be a municipal corporation within the meaning of the quoted constitutional provision, has been held to be a public corporation for municipal purposes whose property is exempt from taxation. (*Turlock Irr. Dist.* v. *White,* 186 Cal. 183 [198 Pac. 1060, 17 A. L. R. 72] ; *Anderson-Cottonwood Irr. Dist.* v. *Klukkert,* 13 Cal. (2d) 191 [88 Pac. (2d) 685].) Similarly reclamation districts have been declared to be public agencies whose properties are likewise exempt from taxation. (*Reclamation Dist.* v. *County of Sacramento,* 134 Cal. 477 [66 Pac. 668].) In *Laguna Beach Water Dist.* v. *Orange Co.,* 30 Cal. App. (2d) 740 [87 Pac. (2d) 46], it is stated that "It must be conceded that it has always been the policy of the law in California since the adoption of the present Constitution, to exempt from taxation property of the state and *state agencies* generally classified as public corpora-

tions". ■ Moreover, while provisions exempting private property from taxation are to be strictly construed, the rule is otherwise as to public property which is to be taxed only if there is express authority therefor. (*Pasadena* v. *County of Los Angeles,* 182 Cal. 171, 174 [187 Pac. 418].)

Exemption of housing authority property was upheld under constitutional provisions substantially similar to ours in *Wells* v. *Housing Authority, supra,* 698; *Knoxville Housing Authority* v. *City of Knoxville, supra; State* v. *Housing Authority of New Orleans, supra,* 737; *McNulty* v. *Owens, supra;* 54; *Marvin* v. *Housing Authority of Jackson, supra,* 156; *Dornan* v. *Philadelphia Housing Authority, supra,* 843; *Krause* v. *Peoria Housing Authority, supra,* 199; *Rutherford* v. *City of Great Falls, supra,* 659; *Re Opinion of Justices, supra,* 536. ■ Even if we assume, as respondent urges, that the ultimate title to the property of the housing authority of a city is vested in the city, as distinguished from the state, and may therefore enjoy tax exemption only when situated within the municipal boundaries of the city—the 1914 amendment of section 1 of article XIII of the Constitution expressly abolishing the tax exemption as to county, city and county or city property situated beyond their respective boundaries—we fail to perceive therein any effect upon the right to tax exemption as to the property of the authorities of any such entities when situated within their respective boundaries. Moreover, the denial of exemption to property beyond the boundaries of the political subdivisions mentioned is confined to the real estate, the improvements thereon being accorded exemption. (*Pasadena* v. *County of Los Angeles, supra,* 174.)

■ Nor do we believe that the right of tax exemption fails because of the possibility of a foreclosure in which title to the property might be lost. The status of the property as tax-exempt or nontax-exempt while in the hands of an authority is not altered by its possible status after disposition by the authority. Nor does the fact that the statute authorizes an authority to give its bondholders the right of foreclosure constitute a gift of authority property. Presumably consideration passes for such a mortgage and any transfer of title thereunder is not a gift but the equivalent of a sale of authority property. The right to sell its prop-

erty should not preclude a tax exemption thereon prior to such sale.

In passing, we are likewise of the opinion that petitioner and other local housing authorities are not required to pay either income or franchise taxes for the reason that the statutes imposing the same do not purport to apply to public bodies. In *City of Idaho Falls* v. *Pfost,* 53 Idaho, 247 [23 Pac. (2d) 245, 246], it was held, on the authority of *Pasadena* v. *County of Los Angeles, supra,* and other cases, that a public body is exempt from an excise tax unless the act specifically includes it.

The tax exemption available to the property of housing authorities includes, in our opinion, bonds issued by them and the income therefrom. The legislature has expressly so declared in Act 3485, *supra,* cited above. A similar exemption was upheld in *Williamson* v. *Housing Authority, supra,* 54, in the following language: "If the project under attack is for public purposes, and the property about to be acquired by it is for public purposes, then the property may be exempted from taxation, and its bonds, being instrumentalities of government, are nontaxable." See, also, to same effect, *Rutherford* v. *City of Great Falls, supra,* 659; *Spahn* v. *Stewart, supra,* 658; *Knoxville Housing Authority* v. *City of Knoxville, supra,* 1087; *State* v. *Housing Authority of New Orleans, supra,* 737. In *Pacific Co.* v. *Board of Supervisors of Los Angeles County,* 8 Cal. (2d) 611, 613 [67 Pac. (2d) 335], this court held that all bonds are now exempt from taxation by virtue of the provisions of section 3627a of the Political Code and the passage of the Personal Income Tax Act (Deering's Gen. Laws, Act 8494). Though not mentioned in the cited case, such exemption would also appear to be permitted by that portion of section 14 of article XIII of the Constitution which declares that the legislature "may exempt entirely from taxation any or all forms, types or classes of personal property". As already stated, it has done so as regards the bonds of housing authorities and the income therefrom.

For the purpose of aiding in the planning and construction of housing projects, section 4 of the Housing Cooperation Law (Act 3484, *supra*) authorizes any state public body to cooperate in the way of zoning and rezoning or furnishing customary facilities, etc., to such projects. We

find no substantial objection to this provision nor to section 13 of the contract between petitioner and the county executed pursuant thereto and for the purpose of aiding and fostering the housing project above described. In *Edwards* v. *Housing Authority of the City of Muncie, supra,* 746, objections to similar legislation and a similar agreement were rejected. It was there said that ''The City of Muncie merely agrees with the other body corporate that it will exercise certain powers, which it now holds with respect to certain matters, in cooperation with, and in aid of, the housing authority in the accomplishment of the public purpose contemplated by the legislation in question. It is as though a civil city agreed with the school city to furnish police, fire and sanitary services in school or playground territory, or agreed with a park board to furnish such services in connection with public parks. No reason is seen why it may not be done if the legislature authorizes it as it has done here; and no authority to the contrary is called to our attention.''

Similarly, the subject is discussed in *McNulty* v. *Owens, supra,* 430, where the following appears: ''It is next charged . . . that the City of Columbia by its contract will attempt to bind the future exercise of the governmental powers with regard to fixing water rates, maintaining streets, etc. An examination of the contract will show that the City is merely obligating itself to furnish municipal services and facilities for these tenants of the same character as those furnished other tenants in the City of Columbia. A municipal corporation is so obligated and this provision in the contract is merely an acknowledgment of the existing law on this point. . . . The proposed contract between the City of Columbia and the Columbia Housing Authority whereby the City will bind itself to demolish unsound and insanitary dwellings equal in number to the number of dwellings constructed by the Authority less the number of unsafe and insanitary units demolished by the Authority constitutes merely an agreement on the part of the City to exercise a power which it already has in such a manner as to cooperate with the program of the Housing Authority. Any action taken by the City in fulfillment of this contract will be subject to all of the limitations to which such actions are subjected under the Constitution and laws of the State; and this contract

neither increases nor decreases the protection afforded to citizens by those limitations. The contract does not constitute an attempt by the City to bind itself in its exercise of governmental functions. It is merely an agreement to cooperate in the use of those functions and as such is valid.'' To the same effect see *Rutherford* v. *City of Great Falls, supra,* 661; *Marvin* v. *Housing Authority of Jacksonville, supra; Williamson* v. *Housing Authority of Augusta, supra,* 50; *Krause* v. *Peoria Housing Authority, supra.* We think that the foregoing shows ample justification for that part of the contract between the petitioner and Los Angeles County by which the latter agrees to eliminate in certain designated ways unsafe and insanitary dwellings. This provision of the contract satisfies the requirements of the federal act.

 In our opinion, the Housing Cooperation Law, *supra,* does not authorize a city or county to make a gift or a loan of its credit in violation of section 31 of article IV of the Constitution. Any appropriation by a city or county will be used by the authority therein established as an agency of the city or county to perform a city, county or state purpose, namely, the elimination of slums. Under substantially similar constitutional provisions, it was so held in *State* v. *Housing Authority of New Orleans, supra,* 733, wherein it was stated that ''The primary purpose of housing authorities is to eradicate the slum menace. In doing so, they lighten the burden of cities in discharging the municipal duty of protecting all citizens indiscriminately against disease, crime and immorality. It is perfectly clear that, when a city [or county] uses public funds for the establishment of a housing authority, whether the funds be used for organization expenses or in the purchase of a small percentage of the housing authority's bonds, the city [or county] is performing, indirectly through a public agency created by the State and sanctioned by its own governing authority, one of the primary functions of government.'' Other decisions to this effect are: *Rutherford* v. *City of Great Falls, supra,* 659; *State* v. *City of Helena, supra,* 518; *McNulty* v. *Owens, supra,* 430. In *County of Los Angeles* v. *Riley,* 6 Cal. (2d) 625, 628 [59 Pac. (2d) 139, 106 A. L. R. 903], it was held that the appropriation of state funds to a county for highway purposes was not a gift to the county for the obvious reason that the building of highways was a state purpose in which the

county was acting as its agent. By analogy, the same reasoning is applicable to an appropriation by either a city or county to a housing authority established within its boundaries, such authority acting as agent in the discharge of the public function or purpose of slum clearance. See, also, *City of Oakland* v. *Garrison*, 194 Cal. 298 [228 Pac. 433].

Nor do we think the statutes authorize either a city or county "to subscribe for stock, or to become a stockholder in any corporation", in violation of the inhibition contained in section 31 of article IV of the Constitution. Authorities created under the statutes are public corporations and do not issue stock. In rejecting a contention that the housing statute there involved authorized an investment by political corporations in stock in violation of a constitutional provision substantially the same as ours, it was declared in *State* v. *Housing Authority of New Orleans, supra,* 733, that "The act provides that municipal corporations 'may legally invest funds within their control *in bonds of an authority* when they are secured by a pledge of the revenues of, or a first mortgage lien on, property' of housing authorities. Housing authorities created by the act are public corporations which have no capital stock.''

Section 18 of article XI of the Constitution precludes any political subdivision of the state, without the assent of two-thirds of the electors thereof, from incurring any indebtedness or liability exceeding in any year its income and revenue provided for such year. In other states it has been uniformly held that slum-clearance and low-rent housing project statutes authorizing, as does our statute, the issuance of bonds by a housing authority do not contravene such constitutional limitation, for no debt or liability is thereby imposed on the city or county wherein the authority is established. (*Edwards* v. *Housing Authority of Muncie, supra,* 745, *Krause* v. *Peoria Housing Authority, supra,* 201, *Williamson* v. *Housing Authority of Augusta, supra,* 50, *Dornan* v. *Philadelphia Housing Authority, supra,* 845, *McNulty* v. *Owens, supra,* 430, *Marvin* v. *Housing Authority of Jacksonville, supra,* 152, *State* v. *Housing Authority of New Orleans, supra,* 740, and *Rutherford* v. *City of Great Falls, supra,* 659.) In the Krause case, *supra,* the following appears: "Appellants contend that the bonds to be issued by the Peoria Housing Authority are obligations of the city of

Peoria and are subject to section 12 of article 9 of the State Constitution. . . . We cannot agree with this contention. By the terms of the Illinois Housing Authorities Act, bonds or obligations issued by such an authority are not 'payable out of any funds or properties other than those of said authority', and they are explicitly declared not to constitute 'an indebtedness within the meaning of any constitutional or statutory debt limitation or restriction'. . . . While the provision that the bonds are not to constitute an indebtedness within the meaning of any constitutional debt limitation is not binding on us, it is clear that the debt here created is not one coming within the constitutional limitation. We have held that obligations which are secured only against the revenues of specific revenue-producing properties are not within the constitutional restrictions on municipal indebtedness.''

On the whole, the statutes involved in all of the above cited cases generally provide, as does our statute, that the bonds issued thereunder are payable solely from the funds or property of the authority issuing them. The statutes also declare, as does ours, that such bonds do not impose any liability on any person or political subdivision of the state. In fact, as already indicated, our statute also requires the bonds to state on their face that they do not constitute a debt of the city, county, state or any other political subdivision thereof. It also provides, as stated above, that such bonds do not constitute an indebtedness within the meaning of any constitutional debt limitation or restriction. While this latter declaration is not binding in a judicial proceeding, it is clear that any debt of an authority evidenced by bonds of the character authorized by the act does not come within the meaning of the constitutional inhibition. ▮ Such debt is clearly the debt of the issuing authority alone— ''a public body corporate and politic''—and is not the debt of the state or of any political subdivision thereof to whom the debt limitation provision of the Constitution is applicable. In support thereof we need look not alone to the decisions of other jurisdictions, *supra*, construing similar housing statutes. We find ample authority for our conclusion in the decisions of this state. (*Joint Highway Dist.* v. *Hinman,* 220 Cal. 578, 587 [32 Pac. (2d) 144]; *Bliss* v. *Hamilton,* 171 Cal. 123, 133 [152 Pac. 303]; *In re Madera Irr. Dist.,* 92 Cal.

296, 342 [28 Pac. 272, 27 Am. St. Rep. 106, 14 L. R. A. 755] ; *Strain* v. *East Bay Municipal Util. Dist.*, 21 Cal. App. (2d) 281, 284 [69 Pac. (2d) 191].) However, even if it were assumed that housing authorities are subject to the debt limitation provision of the Constitution, its bonds being payable exclusively from the revenues or property of the project or projects which are constructed with their proceeds and with federal aid, would not constitute a debt within the meaning of the provision. (*California Toll Bridge Authority* v. *Kelly*, 218 Cal. 7, 14 [21 Pac. (2d) 425] ; *Department of Water & Power* v. *Vroman*, 218 Cal. 206, 217 [22 Pac. (2d) 698] ; *In re California Toll Bridge Authority*, 212 Cal. 298, 302 [298 Pac. 485] ; *Mesmer* v. *Board of Pub. Service Commrs.*, 23 Cal. App. 578, 583 [138 Pac. 935] ; 11 So. Cal. L. Rev. 444, 469.) It necessarily follows from what has been said that no violation of the debt limitation clause results from the loan contract between petitioner, The Housing Authority of the County of Los Angeles, and the United States Housing Authority by which the former agrees to sell and the latter to buy bonds issued by the local authority which are payable solely out of housing project revenues and any annual contributions made by the federal authority.

The state statutes here involved looking to the elimination of slums and the erection in their place and stead of safe and sanitary dwellings of low rent are not fatally defective because of their designation of families or persons of low income as the tenants thereof. The legislation does not thereby become class legislation and result in the improper granting of special privileges or immunities to a favored few. The statutory classification is neither arbitrary nor unreasonable. On the contrary, it is logical and natural. In *Fallbrook Irr. Dist.* v. *Bradley*, 164 U. S. 112, 161 [17 Sup. Ct. 56, 41 L. Ed. 369], it is stated that "It is not essential that the entire community or even any considerable portion thereof should directly enjoy or participate in an improvement in order to constitute a public use." In *Williamson* v. *Housing Authority of Augusta, supra*, 47, the point is disposed of in the following manner: "The argument is that the actual benefits to be derived from the proposed slum-clearance and low-cost housing project are limited to those individuals or families 'who lack the amount of income which is necessary to enable them, without financial assistance, to

live in safe and sanitary dwellings without over-crowding', and that thus the housing act provides special privileges and advantages for a particular group to be selected from persons occupying a certain economic and financial status, to the exclusion of other citizens who by arbitrary standards occupy a different situation. It might also be claimed that the actual benefits derived from maintaining the —— Academy for the Blind are limited to blind children; or that the actual benefits of the —— State Sanitarium are limited to those mentally diseased; or that adults are denied the actual benefits of the public school system because the schools are maintained only for children between certain ages; and that therefore, since they provide privileges and advantages only for a particular group, their maintenance by the state is contrary to our organic law. It is no violation of the constitutional guaranty here invoked for the State to provide direct benefits for a certain group to the exclusion of other citizens, unless done by arbitrary standards. The governing authorities were well justified in limiting to those of moderate income the benefits of the legislation under discussion. The statute makes a classification and states the basis thereof, which cannot be said by this court to be unreasonable.'' Identical reasoning was applied to a similar contention advanced in *Dornan* v. *Philadelphia Housing Authority, supra,* 840, where it was added that ''An occupancy by some may promote, or even be vital to, the welfare of all.'' The contention was also rejected in *Rutherford* v. *City of Great Falls, supra,* 660; *Spahn* v. *Stewart, supra,* 656, and others of the above cited cases dealing with similar statutes.

The argument is advanced that no definite criterion or specific standard is set up by the housing act to guide the authorities created thereunder in uniformly determining with certainty who will come within the phrase ''persons of low income''. It is urged that the vesting of this power of determination in the authorities constitutes an improper delegation of the legislative function. We cannot uphold the contention. The standards specified in the act are sufficiently definite. Section 3, subdivision j, defines persons of low income as ''persons or families who lack the amount of income which is necessary . . . to enable them, without financial assistance, to live in decent, safe and sanitary dwellings, without overcrowding''. Section 9 declares that projects

shall not be operated for profit but shall be rented "at the lowest possible rates" and section 10, subdivision d, precludes authorities from accepting as a tenant any person having an annual net income in excess of five times the annual rental of the quarters, unless there are three or more minor dependents in which event the ratio shall not exceed six to one. As stated, these standards are sufficiently certain. The statute is complete in itself. While the legislature cannot delegate the power to make a law, it cannot now be seriously disputed that it may delegate to administrative boards and agencies the power and authority of ascertaining and determining the facts upon which the laws are to be applied and enforced. In rejecting a similar contention directed against a substantially identical statute, the court in *Edwards* v. *Housing Authority of Muncie, supra,* 746, declares that "The overseer of the poor selects the objects of the public bounty; local officers determine who shall be admitted to poorhouses and public hospitals. It is obvious that the legislature could not itself select the tenants in these public projects, nor could it accomplish its purpose by fixing arbitrary income limits, since income requirements necessarily vary in different communities. . . . We believe that the act provides sufficient standards and rules for the determination of the facts, and that it is not unconstitutional in this respect." The issue likewise was found to be without merit in *Rutherford* v. *City of Great Falls, supra,* 661, *Krause* v. *Peoria Housing Authority, supra,* 202, *Williamson* v. *Housing Authority of Augusta, supra,* 49, *State* v. *Housing Authority of New Orleans, supra,* 739, *Knoxville Housing Authority* v. *Knoxville, supra,* 1087, *Dornan* v. *Philadelphia Housing Authority, supra,* 844, and *Chapman* v. *Huntington W. Va. Housing Authority, supra,* 510.

In view of the recent decisions of the United States Supreme Court, we do not entertain any doubt as to the power of Congress to provide federal aid for housing projects of the type authorized and contemplated by our statute and the statutes referred to in the cited decisions of other states. Nor do we entertain any doubt as to petitioner's ability to acquire ten per cent of the development cost of its proposed project required as a condition to federal aid. It may well be assumed that the federal agency is capable of protecting its own interest in this respect.

 What we have said sufficiently disposes of the many contentions urged by respondent in support of his demurrer, including any contentions not expressly mentioned herein. Many of the arguments of *amici curiae* are the same as those advanced by respondent and are answered herein. Contrary to the additional contentions of one of the *amici curiae*, we find no deficiency in the governor's proclamation calling the special session of the legislature at which the statutes here involved were enacted nor in the legislative finding and declaration of the urgency underlying such legislation. Nor do we find any merit in the contention that the legislature has delegated county and municipal functions to special commissions in violation of section 13 of article XI of the Constitution. As already pointed out, an authority created under the act "shall not transact any business or exercise its powers hereunder until or unless the governing body of the city or the county, as the case may be, by proper resolution shall declare at any time hereafter that there is need for an authority to function in such city or county". In view of this provision of the act, it must be concluded that it is the local governing body, and not the legislature, that confers upon the authority the right to exercise its functions.

As this opinion has progressed, it must have been evident that all of the objections here raised against the constitutionality of the slum-clearance and low-rent housing project statutes here involved have been passed upon by the Supreme Courts of other jurisdictions with respect to similar legislation and under substantially similar constitutional provisions. In every instance the legislation has been upheld. As stated in *Dornan* v. *Philadelphia Housing Authority, supra,* 836, legislation of this type naturally invites "the attack of those who are inclined to regard all experiments in our social and economic life as presumptively unconstitutional. Such challenges must fail, however, if, upon analysis, it appears that the only novelty in the legislation is that approved principles are applied to new conditions. Neither our state nor our federal Constitution forbids changes, merely because they are such, in the nature or the manner of use of methods designed to enhance the public welfare; they require only that the new weapons employed to combat ancient evils shall be consistent with the fundamental scheme of government of the Commonwealth and the nation; and

shall not violate specific constitutional mandates. . . . Here . . . the construction and the operation of housing projects are merely ancillary to the underlying purpose of slum-clearance. The elimination of unsafe and dilapidated tenements is a legitimate object for the exercise of the police power. Apart from the declarations in the Housing Authorities Law itself, the veriest tyro in the study of social conditions knows that the existence of slums is a menace to the health and happiness of the community in which they exist.''

For the foregoing reasons, respondent's demurrer to the petition is overruled. Let a peremptory writ of mandate issue as prayed.

Carter, J., Pullen, J., *pro tem.*, Curtis, J., Spence, J., *pro tem.*, and Houser, J., concurred.