[Civ. No. 11786.   First Dist., Div. One.   Mar. 31, 1942.]

HOUSING AUTHORITY OF THE CITY OF OAKLAND, Respondent, v. JAMES WALTER FORBES et al., Appellants (and fourteen consolidated cases).

Alfred Nelson for Appellants.

James R. Agee, Bernard J. Abrott and James M. Carl for Respondent.

GOODELL, J. pro tem.—Fifteen proceedings in eminent domain were brought to condemn residential property in West Oakland for a low-rent housing project known as Peralta Vil-

lage. The project itself (officially called Cal. 3-1) embraces seven city blocks lying between 8th and 12th, Cypress and Union Streets, and contains 171 parcels. Of these 171 parcels, only 17 are involved in this litigation and they are found in different parts of the area; they are not all contiguous. The cases were consolidated and tried together. There were fifteen separate verdicts aggregating $60,225, upon which judgments of condemnation were entered. The money awarded by the jury was paid into court for the owners (and in a few cases for lien claimants where there were any) and thereupon final orders of condemnation were entered. By stipulation, all fifteen cases are presented on one record, entitled as above.

On this appeal the adequacy of the awards is not questioned. The principal points raised are (1) that the plaintiff failed to offer any proof of public use or necessity, and (2) that the instructions were erroneous and prejudicial.

The legislation under which these condemnations were carried on was enacted in 1938 and is known as the "Housing Authorities Law" (Stats. Ex. Sess. 1938, Ch. 4, p. 9; Deering's 1939 Supp., Act 3483). Its "legislative background" is reviewed at length in *The Housing Authority* v. *Dockweiler,* 14 Cal. (2d) 437 [94 P. (2d) 794], which case held the law constitutional (see, *Riggin* v. *Dockweiler,* 15 Cal. (2d) 651 [104 P. (2d) 367]; *Housing Authority* v. *Superior Court,* 18 Cal. (2d) 336 [115 P. (2d) 468]; *Kleiber* v. *City and County of San Francisco,* 18 Cal. (2d) 718 [117 P. (2d) 657] and further held the purposes of the act to be *public uses and purposes.*

Section 1241, Code of Civil Procedure, provides that "Before property can be taken, it must appear: 1. . . . That the use to which it is to be applied is a use authorized by law; 2. . . . That the taking is necessary to such use; . . ."

The first inquiry is whether this housing project is a public use. It is settled that in the first instance "it is for the legislature to determine whether the use for which property may be taken is a public one." (10 Cal. Jur., p. 290; *City of Pasadena* v. *Stimson,* 91 Cal. 238, 253 [27 Pac. 604]; *Kern County etc. Dist.* v. *McDonald,* 180 Cal. 7, 13 [179 Pac. 180]; *Kleiber* v. *San Francisco, supra.* The Legislature spoke directly upon this subject at the extra session of 1938 in chapter 3 (Stats. Ex. Sess. 1938, p. 6) when it amended section 1238, Code of Civil Procedure, by adding subdivision 21, extending the right of eminent domain ". . . to provide dwellings, apart-

ments or other living accommodations for persons or families who lack the amount of income which is necessary (as determined by the body engaging in said work or undertaking) to enable them to live in decent, safe and sanitary dwellings without overcrowding.'' The section declares all the uses embraced within it to be public uses. On the same day the Legislature enacted the ''Housing Authorities Law'' (chap. 4, p. 9, Id.), section 2 of which declares ''. . . (c) that the clearance, replanning and reconstruction of the areas in which insanitary or unsafe housing conditions exist and the providing of safe and sanitary dwelling accommodations for persons of low income are public uses and purposes for which public money may be spent and private property acquired and are governmental functions of State concern. . . .'' In section 8, subdivision (d) of the same act there is expressly granted, among others, the power ''to acquire by the exercise of the power of eminent domain any real property.'' Section 12 repeats, with more elaboration, the investment of this power as follows: ''Eminent Domain. An authority shall have the right to acquire by the exercise of the power of eminent domain any real property which it may deem necessary for its purposes under this act after the adoption by it of a resolution declaring that the acquisition of the real property described therein is necessary for such purposes . . .''

In *Housing Authority* v. *Dockweiler, supra,* at page 449, the Supreme Court recognized that among the questions there presented ''the one of fundamental importance, and upon the determination of which several of the lesser and incidental issues will turn, is whether slum clearance and public housing projects for low-income families are public uses and purposes for which public money may be expended and private property acquired.'' After remarking that the federal and state statutes are premised upon the expressly declared policy that these are ''public uses and purposes'' the court continues: ''While such a declaration of policy by the legislative branch of the government is not necessarily binding or conclusive upon the courts, it is entitled to great weight and it is not the duty or prerogative of the courts to interfere with such legislative finding unless it clearly appears to be erroneous and without reasonable foundation. [Citing cases.]''

Under the act, however, certain steps must be taken before private property can be taken by eminent domain.

Section 4 of the act provides that before any housing authority shall exercise its powers the governing body of the city or county by resolution must declare "that there is need for an authority to function in such city or county" if it finds certain conditions to exist. (See Dockweiler case, *supra*, at p. 443.) And section 12 of the act, quoted above, imposes the condition that the Authority must adopt a resolution declaring that the acquisition sought is necessary for its purposes.

The record shows a resolution of the Oakland City Council based upon a report of the city planning commission finding, in substantially the statutory language of section 4, *supra*, that "(1) Insanitary and unsafe inhabited dwelling accommodations exist in the City of Oakland; (2) There is a shortage of safe or sanitary dwelling accommodations in the City of Oakland available to persons of low income at rentals they can afford;" and declaring that "there is need for a Housing Authority" therein. A copy of this resolution was attached to the complaint. This was followed in evidence by a certificate of the appointment of the five commissioners, and by notice to the mayor that the resolution had been adopted by the council declaring the need for a housing authority. There was then offered documentary evidence showing that the five commissioners had qualified. Then there was offered in evidence a resolution approving the final plans and specifications for this project ("Cal. 3-1") which had been prepared by the board of architects. The plans and specifications themselves had already been introduced. It was stipulated that identical resolutions and acts applied to each of the parcels under condemnation. The plaintiff then offered in evidence a resolution (required by section 12 of the act) adopted by the Housing Authority on December 1, 1939, authorizing the acquisition of certain land by eminent domain proceedings required for Low Rent Housing Project Cal. 3-1, and directing the filing of condemnation proceedings. A copy of this resolution was attached to the complaint. It was stipulated that a similar resolution was adopted with respect to each parcel involved herein. A comparison of the requirements of the statute with these several pieces of evidence shows that there was full compliance with them. The appellants make no claim to the contrary. On the first question, that of public use, we are satisfied that there was a full and satisfactory showing, and that there can be no question (see the decision

in the first Dockweiler case) that the Legislature has unequivocally declared that a housing project such as this, is a public use. There is nothing in this record to indicate that such legislative determination is erroneous.

As to the question of necessity: The chairman of the board of architects of the Oakland Housing Authority, an architect of twenty-five years' experience, identified the plans and specifications for the housing units here involved, which were thereupon admitted in evidence without objection. He described the "layout," testifying as to the boundaries of the site; that there were thirty-nine buildings in it, that there were seven parking areas provided between a row of two-story flat buildings and that there were walks and drives, play areas, clothes drying yards, disposal facilities, a service yard, and an administration building. When asked respecting garden space he answered that "the entire buildings are fronted alongside by a front yard and in the back by a backyard and the tenants maintain garden areas." He was then asked whether, in his opinion, in order to secure a proper layout for the proposed buildings, "that area sought to be acquired is necessary for the buildings and the auxiliary uses" to which he had referred, and he responded that "The entire area is necessary in order to accommodate the number of units which apparently is the maximum that could be placed upon that given ground area and still allow adequate room for front and backyards, parking areas, light and that sort of thing." He was not cross-examined.

From the foregoing it appears that the respondent, acting through its officers, agents and advisers, selected the seven-block area (within which are the homes of the appellants) as the most desirable for this particular project. There is not the faintest suggestion that the area was selected under the slum clearance provisions of the law; it was selected because it was the most available and desirable site for the new project. It is suggested—and no more than suggested—by the appellants that the act contemplates that the new housing project shall be built upon an area which has been vacated under the slum clearance provisions of the law. But that this is not so is definitely decided in *Riggin* v. *Dockweiler, supra.* The language of the act is in the alternative; the new project *may* be built upon the cleared area, but it *need* not be. The appellants are tax-paying, law-abiding residents who are content where they are, and desire to be undisturbed.

Similar situations are presented in most condemnation cases but it must be remembered that the appellants are individual owners within this seven-block project and that the selection of this particular site for the project is the responsibility of the Housing Authority.

In the selection of a location the condemning party is vested with wide discretion. (*City of Pasadena* v. *Stimson*, 91 Cal. 238, 257 [27 Pac. 604] ; *Vallejo etc. R. R. Co.* v. *Home Sav. Bk.*, 24 Cal. App. 166, 170 [140 Pac. 974] ; *Tuolumne Water etc. Co.* v. *Frederick*, 13 Cal. App. 498 [110 Pac. 134].) Section 1242, Code Civ. Proc., gives the condemning party the right to locate land required for public use but "it must be located in the manner which will be most compatible with the greatest public good and the least private injury." There was every opportunity in this case for the appellants to develop their claim with respect to incompatibility. They did not cross-examine the witness Warnecke at all. They cross-examined the witness Bells at some length. He had given considerable testimony for the plaintiff, after having qualified as a real estate operator and appraiser of twenty-two years' experience in Oakland; he was a director of the Oakland Real Estate Board and had been a member of the City Planning Commission for about eight years and was then its chairman. He was questioned with respect to values. On cross-examination he was first questioned with respect to the way in which the "Peralta Village" area had been selected as against other locations. He testified that the planning commission had conducted a city-wide survey about 1936, to determine housing conditions in Oakland, under the direction of the commission's engineer. That survey was reviewed by the Housing Authority to arrive at "the most logical place for a housing project." According to his testimony, it was the recommendation of the planning commission's engineer to the Housing Authority "that decided the location for West Oakland." The witness had made an investigation of this property about a year and a half before the trial with another appraiser, who came from Washington, with a view to ascertaining "the probable cost estimate of the land in the area." The second part of the cross-examination had to do with the condition of the houses of the appellants, the evident purpose of the questions being to develop the fact that they were structurally sound, habitable, and in good condition despite their age, and that they were sanitary, and were not of the type needing

"clearance" under the act. The third division of the examination was designed to show the accessibility of this area to transportation and its proximity to largely traveled arteries. The last part of the cross-examination dealt with values; first, with those in the area generally, and then, with values of specific parcels. The witness testified that this West Oakland project had been under consideration for about two years, and that within that time values had somewhat enhanced, whether because of the project or not the witness did not say. From this it will be seen that the location of the project was chosen with deliberation and apparently after a broad and comprehensive inquiry into the whole housing problem in Oakland before it ever got into the official stage of resolutions of intention, declarations of necessity, the preparation of plans and specifications and such matters. It must also be borne in mind throughout this discussion that the parcels under condemnation belonging to these fifteen owners are only parts of a large area—the cross-examination of the witness Bells having developed the fact that in the two projects—this and another—two hundred and twenty-five or two hundred and thirty families were moving off the area, and it was suggested by counsel that approximately five hundred families were to be housed when the two projects were completed. All this testimony, and all these factors, developed by the appellants on the cross-examination of the witness Bells must be taken into consideration in connection with the claim now made that there was no showing of compatibility of greatest public good and least private injury. Some of this testimony was of course for the jury to consider on the question, solely theirs (*Vallejo etc. R. R. Co.* v. *Reed Orchard Co.*, 169 Cal. 545 [147 Pac. 238]), of the value of the several parcels, and some of it was for the judge alone on the issue of the necessity for the taking and on the question of least private injury or compatibility (Reed Orchard case, *supra*). By this witness who, although not connected with the Housing Authority, had been familiar with the project from its inception, and who knew how the choice of sites had been made, the appellants had ample opportunity to develop, if they could, that there were more desirable or available locations, or that there would be less private injury if the project had been located elsewhere or that the end sought was for private, not public purposes. (*County of San Mateo* v. *Coburn*, 130 Cal. 631, 634 [63 Pac. 78, 621].) The Stimson case,

p. 255, furnishes this conclusive answer to the argument on claimed incompatibility: ''And we think that when an attempt is made to show that the location made is unnecessarily injurious, the proof ought to be clear and convincing; for otherwise no location could ever be made. If the first selection made on behalf of the public could be set aside on slight or doubtful proof, a second selection would be set aside in the same manner, and so *ad infinitum*. The improvement could never be secured, because whatever location was proposed, it could be defeated by showing another just as good.''

It must be concluded that there was ample proof of public use and necessity, and no proof at all of incompatibility.

The case of *City of Santa Ana* v. *Gildmacher*, 133 Cal. 395 [65 Pac. 883], is relied upon by the appellants as holding that ''the question of necessity is one of fact, to be determined by the jury, in view of all the evidence in the case.'' The Reed Orchard case, *supra*, at p. 557, deals at some length with the Gildmacher case, and concludes as follows: ''The case cannot be regarded as a decision that the owner is entitled as of right to a jury trial upon all the issues that may be presented in an action of condemnation. It does not purport to decide that question. If it so held we should feel obliged to overrule the decision as contrary to the statutory law on the subject.''

The appellants express the fear that their property may be taken for one purpose and thereafter used for another. There is a ready answer to this. There is a presumption, well recognized by the cases, that public officers will carry out their functions and exercise their powers in accordance with the law. (*People* v. *Globe Grain & Milling Co.*, 211 Cal. 121, 128 [294 Pac. 3]; *Ellis Landing & Dock Co.* v. *City of Richmond*, 70 Cal. App. 720, 723 [234 Pac. 336].)

Section 1243, Code Civ. Proc., contains, among others, the following provision: ''A *lis pendens* shall be filed at the time of the commencement of the action in every county in which any of the property to be affected shall be located.'' Appellants point out that no proof of the recordation of any *lis pendens* was ever made, and the transcript is silent on that point. They argue that § 1243 refers to the *jurisdiction* of the superior court to try a condemnation action. The headnote of the section, punctuated into four parts, reads as follows: ''Jurisdiction and venue: Proceedings commenced, how: Change of place of trial: *Lis pendens*.'' It would seem, off-hand, to deal

with four distinct subjects. No case is cited by appellants to the effect that the function of a *lis pendens* is any different in a condemnation case than it is in any other piece of litigation affecting real property. That function is described in *Lee* v. *Silva*, 197 Cal. 364, 373 [240 Pac. 1015], and at more length in *Blackburn* v. *Bucksport etc. R. R. Co.*, 7 Cal. App. 649, 653 [95 Pac. 668]. In the latter case it is said, ''. . . the legislation does not . . . affect in the slightest degree the question of the court's jurisdiction of the subject matter of the suit or of the persons of the parties thereto.'' See, also, 16 Cal. Jur., 644. Here, as in the Blackburn case, the record is silent as to the filing of a *lis pendens;* it does not affirmatively show that none was filed. But as said in the Blackburn case, where the situation was the same, ''even if there was a failure to file a *lis pendens*, the appellant [s] could not be prejudiced thereby, for the only effect of an omission to so record such notice would be to relieve innocent third parties (purchasers or encumbrancers) from the operation of a judgment'' affecting the land in dispute.

An instruction was given to the jury with respect to the testimony of witnesses on value, concluding as follows: ''and you may, in your discretion, reject the testimony of any witness who has expressed such an opinion if it appears to your satisfaction that such an opinion is not based on such thorough knowledge of all the facts and circumstances relating to the property itself as to enable him or her to express a true opinion as to its market value.'' This, appellants say, ''was in effect an instruction that they could utterly disregard the testimony of any witness they desired'' and they urge it as prejudicial error, citing *Hirshfeld* v. *Dana*, 193 Cal. 142 [223 Pac. 451], and *Pearson* v. *Crabtree*, 70 Cal. App. 52 [232 Pac. 715].

In the case of *Los Angeles City High School District* v. *Schumann*, 78 Cal. App. 353 [248 Pac. 737], an instruction which contained almost identical language was given. On appeal the giving of such instruction was urged as error but the judgment was affirmed. After a petition for rehearing had been denied there was a petition for hearing in the Supreme Court. In denying the petition the Supreme Court withheld its approval of the part of the instruction which was criticized, but added ''We do not, however, deem the above portion of the instruction, when read in the light of the other instructions given by the court, to be sufficiently prejudicial

to justify a reversal of the case.'' In view of this comment the instruction cannot be approved, but we are satisfied that when read with the other instructions in the instant case and in connection with all the evidence in the case touching the question of value, that there was no prejudicial error in the giving of the instruction.

As already indicated, by stipulation, fourteen other cases have been consolidated with the instant case. These cases were numbered in the Superior Court 156082, 156083, 156109, 156110, 156111, 156159, 156160, 156505, 156523, 156546, 156583, 156806, 156808 and 156849.

The judgment in the instant case is, and the judgments in the fourteen consolidated cases are, affirmed.

Peters, P. J., and Ward, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied May 28, 1942.